In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1695

DEIDRE DAVIS,

*Plaintiff-Appellant,*

*v.*

YOLANDA CARTER, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03-C-5309—**Amy J. St. Eve**, *Judge.*

ARGUED NOVEMBER 29, 2005—DECIDED JUNE 28, 2006

Before MANION, WILLIAMS, and SYKES, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Plaintiff Deidre Davis, on behalf of her deceased husband James Davis's estate, sued defendant Cook County and various individuals employed by Cook County, alleging that they failed to provide adequate medical assistance to James Davis during his six-day incarceration at the Cook County Jail. Specifically, the plaintiff claimed that despite numerous indications that her husband was in excruciating pain due to sudden withdrawal from methadone medication, no one provided him methadone during his incarceration. The district court granted summary judgment in favor of the defendants, holding that plaintiff had waived any *Monell* claims against Cook County and that the undisputed facts demonstrated none of

the individual defendants were deliberately indifferent to James Davis's medical needs as a matter of law. We reverse, holding that plaintiff has not waived any claims against Cook County, and has presented enough evidence from which a reasonable jury could conclude that Cook County[1] had a widespread custom or practice of failing to provide timely methadone treatment and that individual defendants Officer Collier, social worker Bowers, and Sergeant Martin were deliberately indifferent to James Davis's medical needs. We affirm summary judgment with regard to the other individual defendants.

## I. BACKGROUND

The facts in this case are complicated because of the numerous parties involved. Consistent with summary judgment standards, we will present all facts in the light most favorable to the plaintiff, the non-movant, although, as shown below, many of the facts that the plaintiff relies upon are undisputed.

On Friday, September 27, 2002, James Davis reported to Cook County Jail ("Cook County") to serve a ten-day

---

[1] Defendant Cook County is a unit of local government that finances the Cook County Jail. Cermak Health Services is subcontracted to provide medical care to detainees. The Office of the Sheriff of Cook County employed defendants Officer Gregory Collier, Officer Yolanda Carter, Lieutenant Anita Mackey, and Sergeant Grant Martin as correctional officers at the Cook County Jail, as well as defendant Regina Bowers as a correctional rehabilitation worker. Cermak Health Services employed defendants Peggy Westbrook, Richard Patton, Dalfanita Moore and Alfonso Hill as paramedics. For purposes of clarity, we shall refer solely to Cook County, whose policies and procedures the plaintiff challenges, throughout this opinion.

sentence for a traffic violation. Davis[2] had a history of drug and alcohol addiction and was on a methadone maintenance program at the time he was incarcerated.[3] Davis had received his last dose of methadone on September 27 before reporting to jail. Despite his repeated requests for methadone during his incarceration from September 27, 2002, through October 2, 2002, Davis never received any methadone. On October 2, 2002, Davis suffered a cerebral aneurysm and died the next day.[4]

## A.  Cook County's General Operating Procedures

In the normal course, a correctional medical technician ("CMT") conducts a medical examination of an inmate upon intake. If an inmate informs the CMT that he or she is taking methadone, the CMT will, among other things, fill out a methadone referral card and customarily will refer the inmate to a physician's assistant (PA) or to a physician. (Brittman Dep. at 12.) The PA will then complete a clinical assessment of the inmate. (Brittman Dep. at 17.) At the end of the shift, a CMT typically brings completed methadone referral cards to the pharmacy in the emergency room so that the pharmacist can verify the inmate's participation in a community-based methadone program prior to dispensing

---

[2]  For purposes of clarity, all references to "Davis" shall refer to decedent James Davis.

[3]  Methadone is a synthetic narcotic that is used to treat narcotic withdrawal and dependence. It is typically taken orally once per day and suppresses narcotic withdrawal symptoms between 24 and 36 hours.

[4]  Plaintiff does not contend that Davis's aneurysm was related to the failure to administer methadone and therefore her Section 1983 claim is limited to the alleged suffering that Davis experienced during the five days he was incarcerated without methadone treatment.

methadone medication to the inmate in the jail. (Brittman Dep. at 27; 29.) When the referral cards are brought to the pharmacy, they are date- and time-stamped. (Singh Dep. at 11.) Cook County, however, has no set standard for who is responsible for bringing the completed referral cards to the pharmacy: correctional officers, nurses, or paramedics may bring them, but no one has an assigned responsibility for transporting the referral cards. (Singh Dep. at 10.)

Once the pharmacy department receives an inmate's methadone referral card, the practice is for a pharmacist to call the inmate's outpatient methadone clinic to verify participation in a methadone program. After confirming an inmate's participation in a methadone program, the pharmacy department must then call the security desk at the jail so that a security officer can bring the inmate to the pharmacy for dispensation of medication. (Singh Dep. at 37, 40.) Cook County's pharmacy has no written procedures that provide time limits within which pharmacists must make calls to an outpatient clinic and/or a security officer, nor does it have an established system of recording or follow-up monitoring regarding whether such calls were in fact made. (Singh Dep. at 22, 37-38.) The pharmacy does not maintain records to ensure that an inmate is brought to the pharmacy department by the security office, nor is there any practice of reporting security officers who fail to bring inmates for methadone. (Singh Dep. at 39.)

During the weekdays, there are two shifts in the pharmacy, staffed with two pharmacists per shift. (Singh Dep. at 25.) On Saturdays and Sundays, the pharmacy is staffed with one pharmacist, who works a 7:00 a.m. to 3:00 p.m. shift. The pharmacy dispenses fewer prescriptions during the weekend, in part because there are fewer doctors writing prescriptions during the weekend and in part because there are fewer pharmacists on staff to dispense them. (Singh Dep. at 24-25, 33.)

## B. Davis's Incarceration at Cook County

When he arrived at the jail on Friday, September 27, 2002, Davis received the customary intake medical screening. During this screening, Davis reported to the CMT that he was receiving methadone treatment. After Davis completed his medical intake, his methadone referral card was transferred to the pharmacy and date- and time-stamped on Friday, September 27, 2002 at 8:25 p.m. (Singh Dep. at 15.) The CMT did not refer Davis to a PA and no clinical assessment was conducted. (Brittman Dep. at 26.)

On Friday night, Saturday, September 28 and Sunday, September 29, 2002, no one from the pharmacy department called Davis's methadone clinic to verify his prescription. (Singh Dep. 35.) On Monday, September 30, 2002, three days after Davis was admitted to the jail, pharmacist Satnam Singh verified Davis's participation in a methadone program. (Singh Dep. at 15-17.) That same day, Singh contacted a security officer in the division of the jail where Davis was being held, but did not record the name of the officer with whom he spoke. Davis was not brought to the pharmacy to receive methadone medication on September 30, 2002. (Singh Dep. at 46.)

Davis did not receive methadone medication the next day, Tuesday, October 1, 2002. That morning, inmate workers approached Officer Gregory Collier and reported to him that James Davis was "dope sick" and in need of medical attention. (Collier Dep. at 12-14.) Collier visited Davis and heard him complaining to another inmate that his "stomach felt like somebody was ripping his insides out." (Collier Dep. at 15.) Officer Collier brought Davis to social/rehabilitation worker Regina Bowers and explained to her that Davis needed medical attention. (Collier Dep. at 23.) Officer Collier observed Davis explain to Bowers that he was "dope sick" and that he was not feeling well. (Collier Dep. at 23.) Bowers testified that it was clear that Davis needed medical

attention, and that he looked "terrible," "real bad," and "ill" when she first saw him. (Bowers Dep. at 37-39.) According to Bowers, she called the paramedics' station to get help for Davis, but the unidentified person who answered the phone told her that it "takes three days for the Methadone to clear [*i.e.,* obtain verification of an outpatient program] for [Davis] or for anyone in general." (Bowers Dep. at 48-49.) Bowers stated that in her experience as a social worker for the jail, it takes three days to verify that a person was on methadone. (Bowers Dep. at 51.) Following her alleged telephone conversation with an unidentified person in the paramedics' station (Mrs. Davis contests whether this conversation occurred), Bowers wrote in her log entry, "Ofc. Collier and I tried to get medical attention but no paramedic had been in building at this time" and "it takes according to paramedics 3 days to verify methadone for him." (Bowers Dep. at Ex. 1.) Bowers recommended that Davis not be sent to his jail work assignment that day; Davis did not work that day. There is nothing in the record indicating that Bowers called the 24-hour emergency room available for emergency treatment of jail inmates.

Officer Collier saw Bowers make a telephone call and assumed that she spoke to the paramedics, although he could not be sure she actually did. (Collier Dep. at 32, 34.) He then heard Bowers explain to Davis that it would take three days to get confirmation that he was on a methadone program. (Collier Dep. at 24.) Officer Collier called his supervisor, Sergeant Grant Martin, to advise him that Davis needed medical attention (either the correctional officer or an on-duty sergeant has the direct responsibility to contact the paramedics if an inmate was in need of medical attention). (Collier Dep. at 36-37.) Officer Collier did not call the paramedics himself, and did not verify whether Martin ever obtained medical attention for Davis. (Collier Dep. at 37.) Also, Officer Collier failed to call the 24-hour emergency room.

Sergeant Martin testified that if an inmate is seriously ill, an individual officer has a duty to report that to a paramedic or medical personnel directly and also carries a duty to report that to the sergeant on duty. (Martin Dep. at 21-22.) Sergeant Martin explained that if a social worker informed him that an inmate was too ill to work, his policy was to talk personally with that inmate. (Martin Dep. at 39.) He also testified that his practice was to write up an Unusual Incident Report for an inmate who was unable to work. (Martin Dep. at 39-40.) Martin did not recall ever speaking with Davis, and there is no indication that he wrote an Unusual Incident Report. (Martin Dep. at 39.) There is also no indication that Martin called the paramedics, any emergency personnel or the 24-hour emergency room.

Later in the day, after speaking to Bowers and Officer Collier, Davis called his wife, Deidre. (D. Davis Dep. at 110.) According to Mrs. Davis, her husband told her that he had not received any medication, was in severe pain, and could not keep anything in his stomach. (D. Davis Dep. at 110.) He also complained that the jail guards were ignoring his repeated requests for medical treatment. (D. Davis Dep. at 110.) Following this conversation with her husband, Mrs. Davis called the jail and spoke with a female employee that she remembered as Sergeant Carter. (D. Davis Dep. at 119.) Mrs. Davis explained that her husband was on a methadone program, had not received treatment, and was in excruciating pain. (D. Davis Dep. at 119.) According to Mrs. Davis, Sergeant Carter responded that "Cook County don't work that fast. It don't work that fast for me, and I work here. Maybe he'll get something tomorrow." (D. Davis Dep. at 119.) Officer Yolanda Carter testified in her deposition that she did not recall receiving such a call from Deidre Davis or any other member of James Davis's family. (Carter Dep. at 40.) Carter stated that if she received such a call, she would direct the caller to the inmate's sergeant. (Carter Dep. at

39.) Carter explained that, in such a case, she would not make any record of the call nor would she contact medical personnel. (Carter Dep. at 39-40.)

By the following day, Wednesday, October 2, 2002, James Davis had spent nearly five days in the Cook County Jail and had not received any methadone medication. That day, he approached Lieutenant Anita Mackey, requested methadone treatment, and explained to her that he had filled out a methadone referral card several days earlier. (Mackey Dep. at 16-17.) Lieutenant Mackey was not aware that Davis had been at the jail—and without methadone— since September 27th. (Mackey Dep. at 17). Lieutenant Mackey explained to Davis that he would receive medication once his outside program was confirmed. (Mackey Dep. at 16-17.) She then called the paramedics to ask if Davis had been approved for methadone. (Mackey Dep. at 19-20.) Lieutenant Mackey recalled speaking with a paramedic with the last name of Furlow, who purportedly told Lieutenant Mackey that Davis had not been approved (even though Davis had in fact been approved for methadone on September 30, 2002, two days earlier). (Mackey Dep. at 20.) Lieutenant Mackey did not call the pharmacy to ask if Davis had been approved for methadone, nor did she call the emergency room.

Lieutenant Mackey then called a nurse to administer a medication called "Routine A" to Davis. (Mackey Dep. at 21). Routine A is typically prescribed along with the drugs Compazine and Loperamide to inmates suffering from withdrawal while awaiting methadone confirmation. (B. Davis Dep. at 9, 11.) Routine A helps to alleviate some of a patient's methadone withdrawal symptoms, but does not address all of them, nor is it a substitute for methadone treatment. (Singh Dep. at 63; 65).

Later that day, Lieutenant Mackey received a telephone call from Deidre Davis. Lieutenant Mackey recalled that a

woman who identified herself as Sergeant Carter from Division 8 transferred an "irate" person who had asked to talk to whomever was in charge of Dorm 4, where Davis was held. (Mackey Dep. at 14). Lieutenant Mackey stated that Mrs. Davis told her that she was concerned about her husband and that he needed his methadone medication. (Mackey Dep. at 24). According to Lieutenant Mackey, she told Mrs. Davis that her husband would get his medication once he had been confirmed, but that it would take anywhere from two to three days, or maybe a week to get methadone. (Mackey Dep. at 25). After hanging up with Mrs. Davis, Lieutenant Mackey told Davis to lie down until the paramedics arrived. (Mackey Dep. at 31). There is no indication that Davis was ever seen by the paramedics for the purpose of alleviating his methadone withdrawal, and he was not seen by paramedics until later that day, after he suffered a seizure in connection with his cerebral aneurysm, and died shortly thereafter. (Mackey Dep. at 32).

## II.  ANALYSIS

### A.  Plaintiff did not waive her *Monell* claims.

To establish Cook County's liability under 42 U.S.C. § 1983, the plaintiff was required to show that Davis was deprived of a federal right, as a result of an express municipal policy, widespread custom, or deliberate act of a decision-maker for Cook County, which proximately caused his injury. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690-91 (1978). The plaintiff here alleged that Cook County was deliberately indifferent to Davis's serious medical needs in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The district court held that the plaintiff had waived her *Monell* claim against Cook County by providing only "cursory allegations and arguments" and failing to cite legal authority in her response

memorandum to the defendants' motion for summary judgment. *See Davis v. Carter*, No. 03-C-5309, 2005 U.S. Dist. LEXIS 7478, at *33 (N.D. Ill. Feb. 25, 2005). Although the district court was correct in noting that we have "repeatedly recognized that perfunctory and undeveloped arguments, that are not supported by pertinent authority, are waived." *Davis*, 2005 U.S. Dist. LEXIS 7478, at *34, the plaintiff here did not present merely cursory allegations.

As an initial matter, in their brief supporting their motion for summary judgment, the defendants set forth the proper *Monell* standard for municipal liability, and we see no reason why the plaintiff need cite additional legal authority in her response brief, provided that her argument depended entirely on the application of facts to the well-established *Monell* legal standard already presented in the defendants' brief. Under these circumstances, the plaintiff was merely required to document sufficient evidence to allow a jury to make a reasonable inference that Cook County had a widespread custom or practice that caused a cognizable injury to Davis. And this was done, without requiring the district court to "scour a record to locate evidence supporting a party's legal argument" nor "research and construct the parties' arguments." *See, e.g.*, *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005); *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 921-22 (7th Cir. 1997). As shown below, the plaintiff here provided a wide range of competent evidence that would allow a jury to find both county and individual liability.

Indeed, this case is distinguishable from instances in which we have held that a party has waived a claim for failing to cite both legal authority and supporting factual evidence. *See, e.g.*, *Estate of Moreland*, 395 F.3d at 759 (where plaintiffs "failed to discuss the facts relevant to their claim," the court noted that "[p]erfunctory or undeveloped arguments are waived"); *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 173 n.1 (7th Cir. 1996) (finding argument

waived because appellants neither identified specific evidence objected to nor cited authority for their position). While the plaintiff's arguments here would have been more artful (and perhaps more persuasive to the district court) if she had cited relevant legal authority and fully developed her factual bases, she provided well-reasoned factual arguments supported by citations to the record. This is more than mere perfunctory argument and, as a result, a finding of waiver under such circumstances is not warranted.

### B. There is a disputed issue of material fact as to whether Cook County had a widespread practice of failing to provide timely methadone treatment.

The plaintiff provided sufficient evidence to create a disputed issue of material fact as to whether Cook County had a widespread practice or custom of inordinate delay in providing methadone treatment to inmates, which caused proximate harm to Davis. For instance, in his deposition, pharmacist Singh's testimony, read in the light most favorable to the plaintiff, establishes that there are essentially no policies or procedures in place at Cook County to ensure that the verification of an inmate's outpatient methadone treatment program is conducted in a timely fashion. Similarly, Singh's testimony established that there is an absence of policies or procedures to ensure that once such verification is obtained, security personnel are informed in a timely fashion and inmates are brought to the pharmacy within a reasonable time period. Indeed, Singh testified that there is essentially no established checks-and-balances system to make sure that patients who suffer from methadone withdrawal—which the parties do not dispute is a significant medical issue—do not fall through the cracks for several days (or more). As a result,

according to Singh, it can routinely take one or two days for the pharmacy to confirm an inmate's participation in a methadone program, and perhaps much longer to bring the inmate to the pharmacy as there is no "hard and fast rule" as to when security officers bring inmates to the pharmacy. (Singh Dep. at 39-43, 80.) Moreover, these customary delays may be exacerbated when an inmate's admission occurs during the weekend, where there is very limited staffing in the pharmacy.

In addition to Singh's testimony, Cook County personnel working directly with the inmates confirmed a widespread practice of at least three days' delay simply to verify the inmate's outpatient methadone treatment regimen (and all indications in the record are that the process of confirming an inmate's methadone program is no more than a confirmatory telephone call). For instance, Officer Collier confirmed that, based on his extensive fourteen years of experience working at the jails, it can take up to three days to verify methadone treatment:

> Just by working in there for as long as I have, I know that's what it takes. It takes about that much time if you are on a methadone program before you got incarcerated. It takes about three days . . . . When they come in, they are instantly withdrawn when they come in. They are sick when they come in. Some of them take it better than others. It depends on that individual. Most of them are sick for at least three to five days unless they were on a methadone program when fill [sic] the cards, they approve it. They get on methadone. It's not so bad on them.

(Collier Dep. at 24-26.) In addition, social worker Bowers also testified that it routinely took three days to verify that a person was on methadone. (Bowers Dep. at 51). Indeed, Bowers claimed that the paramedics that she purportedly

contacted also confirmed that it took at least three days to verify methadone treatment and Bowers memorialized this understanding in her October 1, 2002, log entry.[5] (Bowers Dep. at 48-49, Ex. 1). Mrs. Davis testified that Cook County personnel told her that "Cook County don't work that fast," suggesting that the delays that Mr. Davis was experiencing were customary. (D. Davis Dep. at 119). Finally, physician assistant Barbara Davis confirmed that she often provided medications other than methadone for periods of several days in an attempt to limit withdrawal symptoms until the jail received confirmation from the inmate's outpatient program. (B. Davis Dep. at 9). This indirectly confirms that Cook County's custom and practice routinely involved delays of at least three days in obtaining confirmation, and, coupled with Singh's testimony above, suggests that it may be significantly longer before an inmate actually receives methadone.

Cook County's contrary arguments are unpersuasive. The thrust of Cook County's argument, at least with respect to the evidence cited above, is that the testimony of Bowers is entirely inadmissible hearsay and Officer Collier's testimony is too conclusory and void of requisite specific facts to defeat summary judgment. With regard to Bowers, Cook County focuses exclusively on Bowers's purported conversation with an unidentified paramedic, which indeed is inadmissible hearsay if offered solely to prove that Cook County routinely had three-day delays. But Cook County ignores that Bowers also testified as to the delays based on

---

[5] Defendants contend that Bowers's testimony and log entry are inadmissible hearsay and therefore cannot be considered at the summary judgment stage. This evidence, however, is admissible for the purpose of establishing Bowers's notice and awareness of at least alleged routine delays in verifying methadone treatment, although it is certainly inadmissible for establishing the truth of what the paramedic personnel purportedly told Bowers.

her personal experience as a social worker. Bowers had twelve years of experience as a social worker, and she attended to various requests from inmates on a daily basis. (Bowers Dep. at 49). During her deposition, Bowers was asked whether it was her prior understanding as a social worker for the jail that it takes three days for the jail to verify that an inmate is on a methadone program outside of the jail, and she responded in the affirmative. (Bowers Dep. at 51). This, of course, is plaintiff's stronger evidence, and it would indeed be odd if a social worker with experience at Cook County jail lacked any personal knowledge of the general delays in receiving treatment. In any event, to the extent that Bowers's personal experiences are not representative or otherwise lack a firm foundation, that is a fruitful avenue for cross-examination, but is not a good basis for granting summary judgment.

Cook County also argues that Officer Collier's testimony is insufficient because it is nothing more than "generalized evidence," lacking specific facts (such as "the percentage or numbers of inmates who had to wait for three days, two days, or for only a day" and whether those inmates also had serious medical needs). Instead, Cook County contends, Officer Collier's testimony shows—at most—nothing more than "isolated instances where an unknown number of inmates, for unknown reasons, experienced a delay in receiving methadone." Cook County supports this argument by relying on our decision in *Jones v. City of Chicago*, 787 F.2d 200 (7th Cir. 1986). But *Jones* is readily distinguishable. At issue in *Jones* was whether a municipality customarily ignored complaints of sexual misconduct by gynecologists performing pelvic examinations. *Id.* at 205. The plaintiffs contended that sexual misconduct by city-employed physicians was not rare and attempted to support this contention by relying on a broad comment by the Department's Director of Women's Health, who essentially stated that such complaints may not be rare in general

medical practice, whether in public or private clinics.[6] *Id.* at 206. Because this single statement was merely a general conclusion (and one not targeted at the specific circumstances of the plaintiffs' claims), we held that this "statement amount[ed] to little more than a bald and conclusory statement." *Id.* In contrast, here the testimony from Bowers and Officer Collier about routine delays in providing methadone directly targeted the jail facility at issue in this case and was much more than a single "bald and conclusory statement" about correctional facilities in general. *Cf. Jones*, 787 F.2d at 206.

Cook County also contends that plaintiff's claims here fail because she has not presented enough evidence showing a series of past bad acts by Cook County. But to survive summary judgment, a plaintiff need not present a full panoply of statistical evidence showing the entire gamut of a defendant's past bad acts to establish a widespread practice or custom. Instead, it is enough that a plaintiff present competent evidence tending to show a general pattern of repeated behavior (*i.e.*, something greater than a mere isolated event). *See, e.g., Cosby v. Ward,* 843 F.2d 967, 983 (7th Cir. 1988) (explaining that "[t]here is no clear consensus among the courts as to what level of frequency of the challenged conduct evidences a custom, except that it must be more than one instance").

Cook County misinterprets our decision in *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995), where we explained that "[t]he usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is

[6] The Director's initial statement appeared to more directly target the plaintiffs' claims of what occurred with the municipality's public clinics, but, he subsequently clarified that he was only "talking in general in the medical practice," and this court appears to have credited that clarification. *Jones*, 787 F.2d at 206.

by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Id*. And as we indicated, "[w]hen this method of proof is used, proof of a single act of misconduct will not suffice; for it is the series that lays the premise of the system of inference." *Id*. But here, the plaintiff does not point to just one instance of delay without more and ask the court to infer an unconstitutional custom or practice on that basis alone. Rather, the plaintiff points to the delay in the instant case, delays inherent in the methadone verification procedures as related by pharmacist Singh, and the widespread delays attested to by Collier and Bowers based on their experiences as a correctional officer and social worker, respectively, among other circumstantial evidence supporting the existence of a general custom or practice.

Cook County also argues that the plaintiff cannot establish a widespread custom or practice because she failed to identify any other incarcerated individuals who had suffered from lack of methadone treatment. This argument, however, fails to appreciate the difference between showing repeated past bad *acts* versus repeated past *injuries*. *See Woodward v. Correctional Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004). To establish a widespread custom or policy, the plaintiff here was not required to show that Cook County's alleged repeated pattern of delay (*i.e.,* its alleged past "bad acts") actually caused pain and suffering to other inmates in need of medical intervention (*i.e.,* repeated past injuries). *See id.* Instead, it was enough to provide competent evidence tending to show that Cook County routinely failed to provide methadone to inmates for several days. *See id.* (holding that "the plaintiff's failure to introduce evidence of any suicide at the Lake County jail besides [the plaintiff]" did not "doom[] plaintiff's efforts to

prove a custom or practice." "[Defendant] does not get a 'one free suicide' pass"); *see also Estate of Moreland v. Dieter*, 395 F.3d 747, 760-61 (7th Cir. 2005) (citing *Woodward* for the proposition that "the plaintiff need not show that the policy practice, or custom resulted in past deprivations of rights").

Now, whether Cook County in fact routinely had several days' delay, of course, is a disputed material fact at the heart of this case. Thus, Cook County's persistent argument that any delays were isolated and due to factors outside of its control may well carry the day with the fact-finder—but these are not arguments amenable to summary judgment. *See, e.g.*, *Hall v. Ryan*, 957 F.2d 402, 406 (7th Cir. 1992) (affirming the denial of defendants' motion for summary judgment and explaining that "[a]t trial the defendants may be able to adduce various defenses, but they may not now avoid suit under the qualified immunity doctrine on the record as it now exists").

## C. There are disputed issues of material fact as to whether any of the individual defendants were deliberately indifferent to Davis.

The plaintiff has also presented enough evidence to create triable issues of fact regarding whether certain individual defendants were deliberately indifferent by failing to ensure that Davis received timely methadone treatment. To establish a claim for violation of Davis's Eighth Amendment rights, the plaintiff was required to make two showings. *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000). "First, the danger to the inmate must be objectively serious, posing a substantial risk of serious harm." *Id.,* citing *Haley v. Gross*, 86 F.3d 630, 640-41 (7th Cir. 1996). The parties do not dispute that the plaintiff established this element. "Second, the prison official must have a sufficiently culpable state of mind—one of 'deliberate indifference' to inmate health or safety." *Id.*

Deliberate indifference requires something more than negligence, but need not be a purposeful or knowing infliction of harm. *Id.* Deliberate indifference requires that a prison official subjectively know of and disregard a substantial risk of harm. *Id.* "'Deliberate indifference' is simply a synonym for intentional or reckless conduct," and can be established indirectly through circumstantial evidence. *Foelker v. Outagamie County*, 394 F.3d 510, 513 (7th Cir. 2005). As discussed more fully below, the plaintiff has succeeded in providing sufficient competent evidence to allow a jury to make the decision of whether certain individual defendants engaged in reckless conduct with regard to Davis's lack of medical care.

### 1.   Officer Collier and Sergeant Martin

There are disputed issues of material fact as to whether Officer Collier and/or Sergeant Martin were deliberately indifferent. Specifically, Officer Collier admitted that a correctional officer or sergeant has the direct responsibility to contact the paramedics if an inmate is in need of medical attention. Yet in this case, there is a disputed issue of material fact regarding whether Officer Collier recklessly disregarded Davis's medical needs when he failed to contact the paramedics or the 24-hour emergency room directly after he learned that Davis was "dope sick," observed that Davis was suffering, and heard that "it felt like somebody was ripping [Davis's] insides out." *See Foelker*, 394 F.3d at 513 (holding that a reasonable jury could conclude that defendant was recklessly or maliciously ignoring the plaintiff's signs of methadone withdrawal). In addition, there are disputed facts about whether Officer Collier acted reasonably when he delegated responsibility to Bowers to contact the paramedics and ensure that Davis received prompt medical attention. As a result, a reasonable jury could conclude that Officer Collier intentionally or reck-

lessly ignored Davis's need for timely medical attention.

Similar triable issues of fact apply to Sergeant Martin, since there is a disputed issue of material fact over whether Sergeant Martin held the ultimate responsibility for contacting the paramedics or the hospital to ensure that Davis received prompt medical attention. Officer Collier testified that he informed Sergeant Martin of Davis's serious medical condition, but it is undisputed that Sergeant Martin failed to file an Unusual Incident Report or take any action to obtain medical treatment for Davis (or otherwise supervise and confirm that Davis's medical needs were attended). In addition, Sergeant Martin claimed to follow a uniform policy of speaking directly with inmates who reported ill, but there is nothing in the record indicating that he spoke with Davis. Thus, taken together, the plaintiff has presented sufficient evidence to allow a reasonable jury to determine whether Officer Collier and/or Sergeant Martin were deliberately indifferent. *See, e.g.*, *Sherrod v. Lingle,* 223 F.3d 605, 612 (7th Cir. 2000) (reversing summary judgment, where plaintiff "presented evidence which might prove that the prison staff knew of and disregarded a serious risk to his health").

### 2.   Social worker Bowers

Plaintiff has also presented sufficient evidence for a jury to determine whether social worker Bowers was deliberately indifferent. At the outset, there is a heated factual dispute as to whether Bowers actually contacted and spoke with the paramedics on Davis's behalf. Bowers claims to have called the paramedics and to have spoken with someone at the paramedics station. Her log entry appears to support her claim. The paramedics and other emergency medical personnel deposed in this matter, however, either deny receiving such a call or have no recollection of it. In addition, there is no dispute that no paramedics or ERTs attended to James Davis on October 1, 2002. Thus, a

reasonable jury could find that Bowers failed to contact the paramedics as she claims to have done and failed to conduct the requisite follow-up with either Davis, the paramedics, or other correctional or medical personnel. These purported failures could constitute deliberate indifference to the substantial risk of harm that Davis faced. *See Foelker*, 394 F.3d at 513.

### 3.  Lieutenant Mackey

Plaintiff failed to raise any argument in her briefs pertaining to Lieutenant Mackey, and, as a result, has waived any challenge to the district court's grant of summary judgment in favor of Lieutenant Mackey. *See, e.g., Weinstein v. Schwartz*, 422 F.3d 476, 477 (7th Cir. 2005) (failure to develop arguments constitutes waiver).

### 4.  Paramedics Westbrook, Patton, Moore and Hill

The evidence raised by the plaintiff with respect to paramedics Westbrook, Patton, Moore and Hill is insufficient to survive summary judgment. Although there is a factual dispute over whether Bowers placed a telephone call to the paramedics, the plaintiff presents no evidence that could allow a jury to determine which of the paramedics—if any—received Bowers's purported telephone call. The paramedics either deny or cannot recall receiving a call from Bowers, and Bowers cannot identify who answered the call, nor is there testimony from anyone else that could allow the jury to make a reasonable inference as to the identity of whomever answered Bowers's alleged telephone call. Thus, although there is an evidentiary conflict over whether Bowers placed a telephone call, there is simply an evidentiary vacuum pertaining to the identity of the paramedic. And when the evidence provides for only

speculation or guessing, summary judgment is appropriate. *See Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 931-32 (7th Cir. 1995) (holding that evidence leading only to speculation cannot be a defense to summary judgment); *Morfin v. City of East Chicago*, 349 F.3d 989, 1002 (7th Cir. 2003) (same).

### 5. Officer Carter

The evidence presented with respect to Officer Yolanda Carter is also insufficient to create a jury question with respect to whether Officer Carter was deliberately indifferent. The plaintiff's sole evidence was that Officer Carter purportedly received a telephone call from Mrs. Davis and that, after being informed that Davis had not yet received methadone treatment and was in excruciating pain, Officer Carter allegedly responded that "Cook County don't work that fast. It don't work that fast for me, and I work here. Maybe he'll get something tomorrow." Officer Carter then appropriately transferred Mrs. Davis's call to a person responsible for Davis's medical care, Lieutenant Mackey. There is no evidence in the record indicating that Officer Carter's job duties included anything more than answering the telephones, and the plaintiff does not point to any evidence indicating that Officer Carter's position included follow-up responsibility regarding Davis's medical needs. As a result, even when viewing the evidence in the light most favorable to Mrs. Davis, the most that can be shown is that Officer Carter made an insensitive comment to Mrs. Davis, but that otherwise is not enough for a jury to find that she was deliberately indifferent to Davis's medical needs, particularly in light of the undisputed evidence that she promptly transferred Mrs. Davis's call to the appropriate personnel.

### III.  CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment is REVERSED with regard to Cook County and individual defendants Collier, Bowers, and Martin, and is AFFIRMED with regard to individual defendants Mackey, Westbrook, Patton, Moore, Hill, and Carter. We REMAND for further proceedings consistent with this opinion.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*