In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2705

KRYSTEN A. OVERLY,

*Plaintiff-Appellant,*

*v.*

KEYBANK NATIONAL ASSOCIATION,
KEY INVESTMENT SERVICES LLC AND
KEYCORP INSURANCE AGENCY USA (WA), *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cv-00662-SEB-TAB—**Sarah Evans Barker**, *Judge.*

ARGUED JUNE 3, 2011—DECIDED NOVEMBER 10, 2011

Before EVANS[*], WILLIAMS, *Circuit Judges,* and CONLEY,
*District Judge.*[**]

[*] Circuit Judge Evans died on August 10, 2011, and did not
participate in the decision of this case, which is being resolved
by a quorum of the panel under 28 U.S.C. §46(d).

[**] The Honorable William M. Conley, United States District
Court for the Western District of Wisconsin, sitting by designa-
tion.

CONLEY, *District Judge*.  Krysten Overly sued her employer Key Investment Services LLC, its parent company and several of its affiliates (collectively "KeyBank") in Indiana state court for allegedly discriminating based on her gender and retaliating against her because of her complaints of gender discrimination in violation of Title VII of the Civil Rights Act of 1964. KeyBank removed the case to federal court and later filed a motion for summary judgment on both the discrimination and retaliation claims. The district court granted that motion and entered final judgment in favor of KeyBank.

On appeal, Overly argues the district court erred in entering summary judgment because genuine issues of material fact remained regarding whether she was discriminated and retaliated against, subjected to a hostile work environment and constructively discharged because of her gender and for complaining about gender discrimination. Finding no disputed issues of genuine fact material to Overly's claims of gender discrimination or retaliation, and agreeing with the district court's reasons for granting KeyBank's summary judgment motion, that judgment will be affirmed.

## I.  BACKGROUND

Because Overly's claims were decided on summary judgment, we view all facts in the light most favorable to Overly—the non-moving party—and draw all reasonable inferences in her favor. *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011).

*A. Overly's Use of Scanned Signatures*

Overly became a financial advisor with the McDonald Financial Group in 2004. A couple years later, she accepted a similar position with KeyBank, providing financial advice to clients at several of its Central Indiana branches. Initially, Overly's direct supervisor was Andrew Moulton, the regional sales manager for KeyBank's Central Indiana territories. Moulton resigned in January 2007. Rick Bielecki became Overly's new regional sales manager in March 2007. Even though he was her direct supervisor, Bielecki usually only interacted or met with Overly once a month because of his supervisory responsibilities for multiple territories.

Upon becoming regional sales manager, Bielecki would "ride-along" with financial advisors under his supervision in the Central Indiana branches to observe how they conducted business. During a ride-along with Overly on April 12, 2007, Overly explained the procedures used in opening new client accounts. One procedure that came to light was Overly's reliance on her scanned, as opposed to in-person, signatures in executing account documents. Overly explained that Bielecki's predecessor Moulton had suggested that her assistant, Carol Cooney, paste Overly's scanned signature on client documents to "speed up" the opening of accounts on those occasions when Overly could not be at the specific branch immediately to sign the document.

Overly had apparently used this procedure approximately twenty times over the previous year and was

the only financial advisor to do so. Overly also en-
couraged bankers to sell investment products outside
KeyBank's product menu without Overly being there
to supervise.

### B. Compliance Office Investigation and Recommendation

Following their ride-along, Bielecki told Overly to
stop using her scanned signature to open accounts
until he looked into the policy further. Bielecki then
reported to KeyBank's compliance office that Overly
used scanned or "cut and pasted" signatures. Bielecki
also reported that Overly encouraged bankers to sell off-
menu products. This report triggered an investigation.
The compliance office told Bielecki to make certain
both procedures stopped. Bielecki reiterated this to his
entire staff, reminding them that in opening new
accounts each financial advisor should personally sign
a new account application before submitting it.

The next day, Overly spoke with Bielecki and his boss,
Wally DePasquale, the general regional manager. During
this conversation, Overly was told that using scanned
signatures and advising bankers to sell outside the
product list were both improper procedures. Overly
was asked if any other financial advisors in the territory
followed similar practices. Although she did not know
of anyone personally, Overly mentioned being told
that Kirk Green, also a financial advisor, failed to meet
with some clients before signing paperwork to open

new accounts.[1]

Bielecki reported Overly's allegations about Green to the compliance office. He also questioned Green about procedures used to open accounts. Green denied that he ever signed new account paperwork without first meeting the customer. The compliance office told Bielecki to remind his employees, including Green, about the company policy requiring advisors to be present with the customer when signing an account document.

As part of their investigation, the compliance office and Bielecki also contacted bankers working with Overly to ask them about selling financial products outside KeyBank's product menu. One banker admitted making unauthorized sales of variable annuity products without Overly's assistance.

After its investigation, the compliance office recommended that Overly be terminated. Bielecki and DePasquale challenged the recommendation, arguing that Overly should remain employed at KeyBank. Later in the month of May, Overly was given a formal written

---

[1] Overly also mentioned an "Exception List" that was created so certain bankers who completed the necessary course would be authorized to sell additional financial products. Apparently, the bankers working with Green were not on the list and should not have been opening certain kinds of accounts without him. Although Overly continually refers to the "Exception List" as the same thing as her using a scanned signature, the list was considered different and apart from Overly's use of a scanned signature.

warning from the compliance office and a $1000 fine for violations of the fraud and "Know Your Client" policies at KeyBank and the National Association of Securities Dealers Rule 2310. Additionally, a male banker who admitted to selling variable annuities in violation of KeyBank policy was fined $100.

### C.  Overly's Problems with Bielecki

At the end of May 2007, Overly contacted Marcia Hopkins, in KeyBank's human resources department, about the disciplinary actions taken against her by Key-Bank, as well as sexist remarks she attributed to Bielecki. Overly explained that Bielecki had called her "cutie" between 5 and 10 times, though stopped after Overly told him she was not his cutie. Also, in an email, Bielecki stated that it would be better for Overly and Jennifer Miller, a junior advisor, to go to a golf outing because "your pretty faces are much better than my ugly mug." Bielecki also required Overly to leave her planner and purse outside the room when having an office meeting.

Overly expressed concern that the discipline she had received would be marked on her license and hurt her chances for future employment. Hopkins advised Overly that KeyBank had put the issue behind it and that she should do likewise. When Overly continued to ask about the discipline, Hopkins offered to talk with DePasquale, but Overly did not want to involve him. Hopkins suggested that Overly should keep her "head

down and just go back to work and act as though every-
thing's fine."


*D.  Realignment of Financial Advisors*

During the summer of 2007, KeyBank's president,
Mark Vosen, began implementing a company-wide
business plan to increase the number of financial ad-
visors throughout the country. The goal was to enable
sales teams to serve more effectively by reducing the
number of bank branches each advisor would serve. Key-
Bank set the goal of trying to rearrange territories so that
each advisor was responsible for four or five branches
with between $125 million and $150 million in core de-
posits. In January 2006, KeyBank had 81 advisors and, by
January 2010, the number had increased to 211 nationwide.

As the regional sales manager, Bielecki was respon-
sible for the realignment of advisors in his region. In
addition to realigning territories, Bielecki informed the
Central Indiana region that a new financial advisor,
Shaun Weyer, had been hired. With the inclusion of
Weyer as an advisor, the Central Indiana region con-
sisted of 6 advisors: Overly, Weyer, Doug Ferry, Kirk
Green, Deb Bohannon and Marshall Byers. After the
realignment, Ferry was responsible for 5 branches with
a core deposit base of $186,027,005; Bohannon was re-
sponsible for 5 branches with a core deposit base of
$110,798,221; Green was responsible for 5 branches with a
core deposit base of $147,617,964; Byers was responsible
for 7 branches with a core deposit base of $101,335,781;

Weyer was responsible for 6 branches with a core deposit base of $139,416,285; and Overly was responsible for 6 branches with a core deposit base of $147,179,571.

As the result of this realignment of territories, Overly lost 3 of her old branches and gained 2 new ones. Overly was upset by the realignment because she had worked hard to build-up the lost territories. According to Jennifer Miller, the junior advisor working under Overly, the realignment appeared to provide Weyer with all the best branches and to divide up the territories "so that everyone was driving to inconvenient locations, except Shaun."

*E. Overly's Formal Complaint*

On August 7, 2007, Overly sent a letter to KeyBank's CEO alleging that she had been discriminated and retaliated against in the form of (1) the disciplinary warning she received, (2) being called "cutie," and (3) the loss of territory. Two days later, Yolanda Johnson, from KeyBank's human resource department, informed Overly that her allegations would be investigated. Overly was sent a letter on August 22, 2007, informing her that the investigation had been concluded. The letter advised Overly that the investigation had found no evidence of discrimination or retaliation. Instead, the investigation found the discipline Overly received was warranted in light of her improper use of a scanned signature. Further, it concluded that Bielecki's calling her "cutie," while

inappropriate, would not occur in the future. Finally, Overly was informed that the realignment in her district was done in accordance with the company's nationwide business plan.[2]

### F. Overly's Resignation

After Overly received the investigation letter at the end of August, she saw Bielecki only once over the next month and they exchanged maybe 5 to 6 emails. Both Overly and Bielecki attended a symposium at the end of September, but did not speak.

Upon returning from the symposium, Overly personally submitted her resignation letter to Bielecki on October 1, 2007. Upon receiving the letter, Bielecki applauded and grabbed Overly's arm to push her out the door. Overly yelled twice at Bielecki to get his hands off her. As Overly left Bielecki's office, he yelled "Good Riddance Bitch." After her resignation, Overly began working at her own business, Prosperity Financial Advisors.[3]

---

[2] Although not listed in her complaint letter, Overly also began having trouble accessing new client information after the August 1, 2007, territory realignment. As a result, Overly was forced to ask her assistant, Carol Cooney, to obtain new client information for her.

[3] Since April 2007, Overly had been researching the possibility of starting her own financial advising business.

Two weeks after her resignation, Overly filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging that she suffered discrimination and retaliation at KeyBank because of her gender. On January 31, 2008, the EEOC issued her a right to sue letter. On March 14, 2008, Overly filed a second complaint with the EEOC, making similar discrimination and retaliation charges against KeyBank. The EEOC issued her a second right to sue letter on November 24, 2008.

## II. ANALYSIS

We review the district court's grant of summary judgment de novo, viewing all facts in a light most favorable to Overly. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010). Even under this lenient standard, however, Overly has not met her burden of proving her employer discriminated on the basis of her gender in violation of Title VII. 42 U.S.C. § 2000e-2(a)(1). Because Overly advances Title VII claims for a hostile work environment, constructive discharge and sex discrimination, we address each in turn.

### A. Title VII Sexual-Harassment Claim

#### 1. Hostile work environment

Overly claims that she was subjected to a hostile work environment after Bielecki became her supervisor. To survive KeyBank's summary judgment motion on this claim, Overly must demonstrate that: "(1) her work

environment was both objectively and subjectively of-
fensive; (2) the harassment complained of was based
on her gender; (3) the conduct was either severe or perva-
sive; and (4) there is a basis for employer liability." *Scruggs
v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009).
In determining whether the sexist conditions of employ-
ment are severe or pervasive enough to create "an
abusive working environment," we consider "the
severity of the allegedly discriminatory conduct, its
frequency, whether it is physically threatening or humil-
iating or merely offensive, and whether it unreasonably
interferes with an employee's work performance." *Id.*
The conditions Overly worked under while Bielecki
acted as her supervisor between April and Septem-
ber 2007 simply do not meet this standard.

While both inappropriate and condescending, Bielecki
referring to Overly as "cutie" 5 to 10 times over the
course of two months is not sufficiently severe or
pervasive to create a hostile work environment by itself,
especially since it is undisputed that Bielecki stopped
when asked. Further, Bielecki's single statement that
Overly's and another female co-worker's "pretty faces"
would better represent KeyBank at a golf outing than
his "ugly mug" is not objectively offensive, even if
Overly may have found it subjectively so. Indeed, nothing
Bielecki is alleged to have done because of Overly's
gender, taken individually or as a whole, can be viewed
as threatening or humiliating, much less frequent
enough, to have unreasonably interfered with her work
performance. Accepting as true for purposes of summary
judgment that Bielecki also made Overly leave her purse

and planner outside of a meeting, that one-time act is also not sufficiently severe or frequent to meet the *Scruggs* standard.

Perhaps a combination of all of these incidents, along with the discipline Overly received for using a scanned signature, might have approached this level, but Overly has offered no evidence to permit a reasonable jury to find the discipline was based on anything other than a violation of KeyBank policy. Although Overly asks us to "infer" that the discipline was gender-related, such an inference is not reasonably supported by the record. As such, we need not accept it. *See, e.g.*, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). ("Even on summary judgment, district courts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record.").

Overly readily admitted to being the *only* financial advisor to use scanned signatures in violation of written policy; she was disciplined accordingly. Regardless of what Overly's previous supervisor had told her, there is no dispute that the procedure violated KeyBank's written policy, as evidenced by the fact that no other advisors were using scanned signatures. Even accepting Overly's secondhand information that a co-worker engaged in some other improper conduct was not disciplined after denying engaging in it does not make reasonable an inference that Overly was disciplined *because* she is a woman.

Similarly, Overly has failed to offer evidence sufficient for a reasonable jury to find the realignment of territories

was gender-based. Every financial advisor in the Central Indiana region received reassigned territories as a result of the company's undisputed business plan to add more financial advisors in an effort to increase client services. At most, the evidence in the record creates an inference that Bielecki rearranged the territory to favor Shaun Weyer at the inconvenience of all other advisors, both male and female, but such preferential treatment is evidence of favoritism, not sexism.

The financial figures offered by Overly are, if anything, even less supportive of her claim of gender-based discrimination. Overly estimates that she would lose approximately $100,000 over the next year as a result of the realignment. This is based on the fact that between January 2007 and August 2007, she had earned $172,374.94, which averaged out to approximately $22,575.12 per month, and the fact that she then received a check in October from sales in September 2007 that totaled $8,226.02. However, this figure is of little, if any, evidentiary value in determining the likely financial impact of realignment on Overly's pay. This is because Overly provides no actual, monthly earnings, leaving no way of determining whether the October amount is anomalous, much less whether the asserted drop in income was likely to continue over time. Overly's comparison of a single month's performance against a seven months' average also fails to account for month-to-month fluctuations, nor did she provide how much she would have earned from her old territories. In the end, one could only speculate wildly about the actual financial effect of the

realignment from the limited information Overly provided.[4]

The conduct coming closest to suggesting interference with Overly's work performance is her loss of access to new client information after the reassignment of territories. According to Overly at least, she was denied access to new client information between August and September, forcing her to seek this information through her assistant. There is, however, no evidence from which a reasonable jury could infer that the limitation was a mere annoyance resulting from the realignment process, as opposed to an intentional and unreasonable interference motivated by gender bias. In fact, although the problems with accessing new clients began occurring when the reassignment of territories went into effect on August 1, Overly did not include the problem in her letter to KeyBank management informing them of the discrimination and retaliation she claimed to be experiencing. Further, Overly never mentioned the problem to human resources, even though she was discussing her discrimination and retaliation allegations with them during the month of August.

---

[4] Even assuming Overly was earning less after the reassignment, there is nothing in the record to show she took a *disproportionate* hit financially than did her male counterparts. At most, the evidence provided by Overly proves she would receive a reduced slice of the income pie, but this is hardly surprising given that the company added an additional advisor to serve the same number of sale territories.

Even assuming that the conduct was an unreasonable, intentional interference, there is no evidence to suggest the conduct was the result of gender discrimination. While both Overly and her assistant stated that she was the *only* advisor who was denied access to client information, Overly was not the only woman advisor, suggesting that the conduct was the result of personal animus toward Overly, rather than gender-based animus. Ultimately, this evidence is only speculation that the conduct was the result of gender discrimination and reliance on speculation is not enough to get the case to a jury. *See Davis v. Carter*, 452 F.3d 686, 697 (7th Cir. 2006) (explaining that "when the evidence provides for only speculation or guessing, summary judgment is appropriate").

By far the most disturbing evidence of gender bias comes *after* Overly had already resigned, but this cannot establish a hostile environment *before* her resignation. While it is unacceptable for a person to grab another in the workplace without permission, much less to refer to a woman as a "bitch," Bielecki's actions do not satisfy Overly's burden to prove she suffered objectively severe and pervasive gender discrimination *while* working for KeyBank. In fact, Overly admits that she had very little face-to-face interaction with Bielecki during the six months he supervised her. At most, they met once a month. The fact that Bielecki acted wrongly after Overly resigned does not serve as evidence of a hostile work environment while working at KeyBank. Accordingly, the district court's grant of summary judgment on Overly's hostile work environment claim was proper.

*2. Constructive Discharge*

To prevail on her claim of constructive discharge, Overly would have had to advance evidence "even more egregious than that needed for a hostile work environment such that [s]he was forced to resign because [her] working conditions from the standpoint of the reasonable employee had become unbearable." *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 401-02 (7th Cir. 2010) (internal quotation omitted). Thus, Overly's failure to advance evidence sufficient to find a hostile work environment claim also dooms her constructive discharge claim.

*3. Discrimination*

Finally, Overly claims discrimination based on her gender, purportedly proceeding under what has (somewhat inaccurately) been denominated as the "direct method" of proof. "A plaintiff may prove discrimination using the direct method by establishing either an acknowledgment of discriminatory intent or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007). Overly does neither.

Despite Overly's argument to the contrary, Bielecki's patently offensive response to Overly's resignation is not direct evidence of gender discrimination. Some additional evidence would be required for that statement to be regarded by a reasonable jury as a confession that any previous, adverse conduct was taken for a discrim-

inatory purpose. *See Lim v. Trustees of Ind. Univ.*, 297 F.3d 575, 580 (7th Cir. 2002) (requiring" direct evidence" to "prove the particular fact in question without reliance upon inference or presumption") (internal quotation and emphasis omitted). For example, if the term "bitch" were uttered as an explanation for contemporaneously singling out Overly from her male counterparts for loss of pay, territory, benefits or opportunity, then no inference would be required. As already discussed, Overly has offered no such evidence here.

The statement is also not circumstantial evidence of discrimination, since it was neither made around the time of any adverse employment actions, nor references any adverse employment actions (like the discipline letter Overly received back in May). Instead, however offensive, the statement was a stray remark made after Overly resigned. *See Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 781-82 (7th Cir. 2007) (holding "stray remarks that are neither proximate nor related to the employment decision [at issue] are insufficient to defeat summary judgment) (internal citation and quotation marks omitted"); *see also Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006) (holding "isolated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus").

As discussed above in the context of Overly's hostile work environment claim, there is a general lack of other circumstantial evidence from which to infer that any of Bielecki's conduct—such as his reassigning of Overly's territories, temporarily being denied access to client

accounts, or reporting her to the compliance office—was the result of intentional, gender-based discrimination. The only alleged, gender-related comment was Bielecki calling Overly "cutie," something by all accounts he stopped when told she did not like its use. Moreover, its use is not linked to or contemporaneous with any adverse employment action.

Although viewing the facts in a light most favorable to Overly suggest that Bielecki may not have liked her, and even that he may have been making her life at KeyBank more difficult, those same facts do not support a reasonable inference that he did not like her because she is female. Simply put, there are no bits and pieces of circumstantial evidence that "point directly to a discriminatory reason for [Bielecki's] action." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008) (internal quotation omitted). Accordingly, the district court was correct in granting KeyBank's motion for summary judgment on Overly's claim for gender discrimination.

## B. Title VII Retaliation Claim

To have survived summary judgment on her retaliation claim using the direct method, Overly needed to show "(1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action taken by the employer; and (3) a causal connection between the two." *Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007). The parties agree, as do we, that Overly's complaint to KeyBank's HR department about Bielecki's alleged sexual harassment is a protected

activity under Title VII's anti-retaliation provision. 42 U.S.C. § 2000e-3(a). The problem remains with Overly's inability to show that Bielecki took any adverse action against her *because of* her complaint.

Overly points to the reassignment of some of her territories as evidence of retaliation. No reasonable jury, however, could find that the reassignment was because of Overly's complaint. Instead, the reassignment was in line with KeyBank's national business plan to hire more financial advisors and assign fewer territories to each advisor. There is not even evidence that at the conclusion of the reassignment of territories within the Central Indiana region, Overly's new territories made her any worse off than the other advisors in the region. Even the junior advisor working for Overly noted that the reassignment appeared bothersome for everyone—except for the newly-hired advisor—who unsurprisingly was a former colleague of Bielecki.

The same is true of Overly being denied access to new clients. The initial problem with this conduct being evidence of retaliation is that by her own admission Overly failed to mention it in her August 7 written complaint despite being denied access to clients when the reassignment occurred on August 1. More importantly, there is no evidence from which to infer that Overly was denied access to clients because of her sex. As the record shows, no other advisors, including other female advisors, were denied access to clients. In fact, Bielecki never mentioned or discussed Overly's complaint.

The record is simply void of the bits and pieces of circumstantial evidence necessary to establish a causal link between Overly's complaint and Bielecki's conduct. As a result, the district court properly granted KeyBank summary judgment on Overly's retaliation claim.


### III.  CONCLUSION

The judgment of the district court is therefore AFFIRMED.