In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3669

NORMA PEREZ,

*Plaintiff-Appellant,*

*v.*

THORNTONS, INCORPORATED,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CV 01787 — **Blanche M. Manning**, *Judge.*

ARGUED APRIL 23, 2013 — DECIDED SEPTEMBER 30, 2013

Before RIPPLE and HAMILTON, *Circuit Judges*, and
STADTMUELLER, *District Judge.**

HAMILTON, *Circuit Judge.* All employees, not only perfect
employees, are protected by Title VII. Plaintiff Norma Perez
was in all likelihood far from a perfect employee. From 2005
until 2009 she worked for defendant Thorntons, Inc., a gasoline

---

* The Honorable J.P. Stadtmueller of the Eastern District of Wisconsin,
sitting by designation.

and convenience store chain. She was working as a retail store manager in November, 2009 when she deeply discounted about $127 worth of candy bars that she sold to herself for only $12. She was fired for failure to "control cash and/or inventory." But only a few months earlier, Perez's non-Hispanic male supervisor had committed a similar act and was merely warned, not fired.

Perez brought suit under Title VII of the Civil Rights Act of 1964 for gender and national origin discrimination. The district court granted summary judgment in Thorntons' favor. If Perez discounted the candy she "bought" without permission, her behavior was wrongful, and a jury might well find that her firing was not tainted by unlawful bias. In reviewing a grant of summary judgment, however, we must give Perez the benefit of conflicts in the evidence and any reasonable inferences in her favor. In that light, a jury could find that Perez's wrongdoing for which she was fired was comparable to the wrongdoing of her non-Hispanic male supervisor, and that the supervisor's animus against women and Hispanics tainted the decision to fire her. Based on this record, a jury must sort out the conflicting evidence and decide why Thorntons chose to treat arguably similar wrongdoing so differently. Accordingly, we reverse the district court's judgment and remand for further proceedings.

*Facts for Summary Judgment*

We assume that the following facts are true for purposes of summary judgment. Perez was hired by Thorntons in January, 2005 as a customer service representative in its store in Cicero, Illinois. Her job included stocking the shelves and operating

the cash register. She was promoted a year later to retail store manager. Her duties then included supervising the customer service representatives at the store. In November 2008, she was transferred to a different store located in Summit, Illinois. Bill Darlington was Perez's regional manager. He made the original decision to hire her and then promoted her and transferred her. The Summit store was a "high volume" store, and Darlington believed that a transfer to the Summit store would broaden Perez's management experience.

At the Summit store, Perez's immediate supervisor was store general manager Donald Koziol. When Perez and Koziol met, Koziol told her that "he [didn't] want [her] in the store; that he [didn't] want to work with [a] woman." Perez informed Darlington about Koziol's comments, and informed him of her preference to remain at the Cicero location. Darlington refused to return Perez to the Cicero store, telling her that she either had to work where he had assigned her or would lose her job with Thorntons. Perez testified that later, in the summer of 2009, Koziol said to Perez, "this is the reason why I don't like to work with women, always have something to do with the kids or they have a period." He also told her that he "did not like" Hispanics. However, Perez did not disclose these later remarks to Darlington or anyone else at Thorntons.

Every month, each Thorntons store received a "Sales Planner" from the store support center that identified upcoming store promotions and items that would be specifically promoted for sale with discounted prices. Stores were required to follow these directives strictly. Every month each store conducted a "change over," changing the manner in

which particular products were priced as dictated by the Sales Planner.

During a store visit in October 2009, Darlington noticed that the candy inventory was low. When Darlington talked to Koziol and Perez about the store's candy bar sales, Darlington learned that the store's cashiers had deviated from the Sales Planner's directive. Cashiers had been allowing customers to pay sale prices for full-priced candy bars, using a sale-priced bar to scan the purchase of the full-priced bar into the register. Darlington warned both Koziol and Perez that they could not swap full-priced candy for discounted candy.

The November 2009 Sales Planner ordered that pre-priced versions of Nestle brand candy bars were to be sold at a price of two for $2.22. The Summit store was scheduled for change over on November 4, 2009. On the date of the change over, Perez rang up approximately 80 of these candy bars and sold them to herself. Her transactions were captured on store video and were recorded in the cash register's memory. Perez initially rang up the candy bars at the approved price—two for $2.22—but then performed a manual price override, ultimately charging herself only 15 cents for each candy bar.

A few days later, Darlington conducted a routine review of the store's video surveillance and saw Perez buy a large number of candy bars at the approved price, void the transactions, manually override the price, and walk out of the store carrying the discounted candy bars she had purchased. Darlington reported what he had seen to Lori Roberts, the human resources manager for Thorntons' Northern Division. Darlington then went to the store to investigate. He met with

Koziol and showed him the video footage of Perez buying the candy. He asked Koziol if he was aware that Perez had purchased the candy after performing the price overrides. Koziol denied having any knowledge of the incident or giving Perez permission to make the purchase. Darlington then called Perez at home. Darlington told her to report to the store immediately for a meeting. When she arrived, Darlington initiated a conference call with Roberts. Darlington, Roberts, and Perez were the only people on the call. Darlington showed Perez the video footage and asked her to explain the price overrides.

Perez's account diverges from Darlington's and Roberts' at this point, but of course, on summary judgment, we must accept Perez's version as true.[1] Perez testified that she told Darlington and Roberts that she had Koziol's permission to conduct the price overrides. Darlington suspended Perez until further notice. Perez departed and Darlington consulted with Roberts. Darlington told Roberts that he wanted to fire Perez. Roberts concurred with that decision, and Darlington and Roberts then notified their respective superiors of Perez's termination. Darlington notified the regional vice president, Sam Picone. Roberts notified the executive vice president of human resources, Brenda Stackhouse. Neither Picone nor Stackhouse objected to Darlington's decision.

---

[1] In Thorntons' version of this meeting, Perez told Darlington that she could not explain the price overrides and that she did not have anyone's permission. Her only "defense" at that time was that Koziol had also bought candy bars at a marked-down price. Darlington then reviewed surveillance footage from earlier that day, which revealed that Koziol had not purchased any products at a reduced price.

On November 10, 2009, Roberts called Perez at home and told her she was being fired. The personnel action form noted failure "to control cash and/or inventory" as the reason for her termination. Thorntons later clarified that Perez was fired for her failure to adhere to prices stated in the November Sales Planner and for violating Thorntons' "Write-Off Policy." The Write-Off Policy prohibited managers from writing off more than $25 of merchandise without an auditor as a witness. Although the Write-Off Policy was in effect during Perez's employment, Thorntons has not pointed to evidence in the record showing that she knew of its existence, or that she knew the Write-Off Policy would trump permission from her immediate supervisor.

If that were the entire record, Perez would not have a viable claim for discrimination. But a few months before Darlington terminated Perez, store manager Koziol used his personal credit card to "buy" a large quantity of beer and wine from the store at full price. The store support center noticed the transaction and reported it to regional vice president Picone. Picone and Darlington confronted Koziol about his transaction. Koziol explained to both supervisors that he had discovered that beer and wine were missing from the Summit store. Koziol suspected that it had been stolen, but he did not know by whom. He attempted to cover up the missing inventory by making a dummy purchase on his own credit card so that the shortage would not be discovered during an upcoming corporate audit. He claimed that he wanted time and opportunity to identify the culprits on his own. His idea, he told his supervisors, was that if the theft went undetected, the thieves might return to try to steal more alcohol, giving Koziol

the chance to catch them in the act. Koziol did not have Thorntons' permission to run his sting operation in the Summit store. In spite of the fact that, at best, Koziol had engaged in a cover-up and was risking additional theft, Picone issued a written reprimand and a warning to Koziol, but Koziol kept his job. Darlington testified that he was involved in Picone's "coaching" of Koziol.

*Analysis*

Perez brought suit under Title VII of the Civil Rights Act of 1964 for national origin and gender discrimination. See 42 U.S.C. § 2000e–2. She contends that Thorntons fired her because she is Hispanic and a woman. Thorntons moved for summary judgment on her claims. The district court granted summary judgment in Thorntons' favor, and Perez has appealed. Summary judgment is proper if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review *de novo* a ruling granting summary judgment. *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 702 (7th Cir. 2012). Examining the evidence in the light most favorable to Perez, and construing all inferences in her favor, we will affirm summary judgment only if there are no genuine issues of material fact and Thorntons is entitled to judgment as a matter of law. *Naficy v. Illinois Dep't of Human Servs.*, 697 F.3d 504, 509 (7th Cir. 2012).

Under current law, there are two ways Perez may prove her claims: the "direct" and "indirect" methods of proof. *Collins v. Amer. Red Cross*, 715 F.3d 994, 999 (7th Cir. 2013). "Under the direct method, a plaintiff must provide either direct or

circumstantial evidence that the employer had a discriminatory motivation. And under the indirect method, a plaintiff must satisfy the familiar requirements of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Id.* (internal citations omitted). But we recognize and join the majority of active judges in this circuit who have opined that the time has come to jettison the "ossified direct/indirect paradigm" in favor of a simple analysis of whether a reasonable jury could infer prohibited discrimination. See *Hitchcock v. Angel Corps., Inc.*, 718 F.3d 733, 737 (7th Cir. 2013), citing *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring) ("By now, … the various tests that we insist lawyers use have lost their utility … . In order to defeat summary judgment, the plaintiff one way or the other must present evidence that she is in a class protected by the statute, that she suffered the requisite adverse action (depending on her theory), and that a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any noninvidious reason. Put differently, it seems to me that the time has come to collapse all these tests into one."); *Naficy*, 697 F.3d at 514 (citing *Coleman* concurrence with approval); *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 680 (7th Cir. 2012) ("the direct and indirect methods for proving and analyzing employment discrimination cases … have become too complex, too rigid, and too far removed from the statutory question of discriminatory causation"); and *Harper v. C.R. England, Inc.*, 687 F.3d 297, 313–14 (7th Cir. 2012) (discussing *Coleman* concurrence and applying a more streamlined, collapsed version of the direct/indirect tests).

Perez contends that her claim survives under either the indirect or the direct methods. We conduct our analysis under

those traditional tests, and we find, as explained below, that under each method Perez has raised issues of material fact that merit resolution by a jury. The similarity of the analysis helps show, however, that the differences between the methods are narrowing.

I.  *Indirect Method*

Under the indirect method, a plaintiff must first establish a prima facie case by providing evidence "that (1) she is a member of the protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably." *Naficy*, 697 F.3d at 511. In disparate punishment cases, like this one, the second and fourth prongs merge and are satisfied by a showing that a similarly situated employee outside the plaintiff's protected class committed a similar act but was subjected to less severe discipline. *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007). If the plaintiff makes this showing, the burden shifts to the employer "to introduce a legitimate, nondiscriminatory reason for the employment action." *Naficy*, 697 F.3d at 511. Then, if the employer meets that burden of production, the burden shifts back to the plaintiff to provide evidence that the employer's stated reason was pretextual. *Id*. at 511–12.

A.  *Similarly Situated Co-worker*

The district court found that Perez failed to establish her prima facie case because she failed to demonstrate that a similarly situated employee outside of her protected class engaged in conduct similar to hers but was subjected to less

severe discipline. "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination . … The 'similarly situated' prong establishes whether all things are in fact equal." *Filar v. Board of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008) (internal citation omitted).

To satisfy this requirement, a plaintiff must identify at least one employee who is directly comparable to her in all material respects. See *Coleman*, 667 F.3d at 846. The purpose of the inquiry is to "eliminate other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable'—discriminatory animus." *Id.*, quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), aff'd, 553 U.S. 442 (2008). The proposed comparator need not be identical in every conceivable way, however, and courts must conduct a "common-sense examination." *Coleman*, 667 F.3d at 846 (quotation omitted).

To satisfy this requirement, Perez argues that Koziol, her non-Hispanic male supervisor, committed an infraction comparable to hers but was not disciplined as severely as she was. Perez openly purchased candy bars at a marked down price with (we must assume) Koziol's permission. She was fired. Koziol covered up theft from the store and, without the consent of his supervisors, concocted a one-man sting operation that invited additional theft—yet he was merely warned. Thorntons argues that Koziol's conduct is not comparable to Perez's conduct because Thorntons suffered no actual economic harm as a result of Koziol's act. A jury might buy that explanation, but we cannot resolve that issue on

summary judgment. Koziol's act covered up a much larger actual economic loss and put Thorntons at a high risk of future actual economic loss. Also, Koziol acted in secret, without the knowledge or permission of his supervisor. Perez, though, purchased the discounted candy bars openly and with, we must assume, Koziol's consent. At the end of the day, both of these infractions involved inventory control, and yet the employees were treated very differently by Thorntons' higher management. We believe it should be left to a jury to decide whether they were similar enough to support an inference of discrimination.

Our dissenting colleague disagrees, noting as we often have that "we do not sit as a super-personnel department to determine which employment infractions deserve greater punishment. It is enough that the misconduct that led to the adverse job action in question is *sufficiently distinct* to render the proposed comparators not similarly situated." *Post* at [32] (emphasis added), quoting *Harris v. Warrick County Sheriff's Dep't*, 666 F.3d 444, 449 (7th Cir. 2012). On this basis, the dissent accepts Thorntons' stated explanation for firing Perez but not Koziol—that Perez's conduct caused "actual loss to the company" while Koziol's "had no such effect." *Post* at 32.

At first glance that is true, but the picture for purposes of summary judgment is more complex. Koziol's conduct was deceptive, done secretly and without the consent of a supervisor. Perez, by contrast, acted openly and with the consent of her supervisor. In addition, Koziol's act caused no actual loss to the company only because he was improperly covering up a real theft. Moreover, he concocted an "investigation" that would have risked additional loss if he

had not been caught. Ultimately, the crux of the issue is whether Perez's and Koziol's misdeeds were "sufficiently distinct" to distinguish meaningfully between them at summary judgment, or whether a jury could reasonably find they were comparable. We believe that the arguable differences between causing modest actual economic loss with the consent of a supervisor and covering up a significant theft and risking additional economic loss without the consent of a supervisor are too fine to make as a matter of law on summary judgment. Whether Perez's and Koziol's misconduct was comparable is a genuinely disputed issue of material fact.

Thorntons argues further, however, that whether or not Perez had Koziol's consent is immaterial because even with his consent, Perez's purchase still violated Thorntons' Write-Off Policy. That policy prohibits any write-offs of more than $25 by any employee except with the express permission of a corporate auditor. Thorntons presented evidence that the Write-Off Policy was in place while Perez was employed with Thorntons, but it has not pointed us to evidence that Perez knew of its existence or that she would have had any other reason to believe that Koziol's permission was insufficient to bless her action. Also, at the time of Perez's firing, Thorntons' stated reason for its decision was her failure to "control cash and/or inventory," and Koziol's infraction would also certainly qualify for that description.

Thorntons also argues that Koziol is not comparable to Perez because they were disciplined by different decision makers—Koziol by Picone and Perez by Darlington. This argument is belied outright by Darlington's deposition testimony that was the basis of Thorntons' motion for

summary judgment. Darlington testified that he was present when Picone confronted Koziol and was involved in the decision to warn but not terminate Koziol. He also testified that he advised Picone of Perez's infraction, and that Picone assented to Darlington's decision to fire Perez. Darlington and Picone were both sufficiently involved in both Koziol's and Perez's discipline to undermine Thorntons' argument, at least as a matter of law.

Our dissenting colleague believes that we should not consider the evidence of Darlington's involvement in Koziol's discipline because Perez "admitted" in response to Thorntons' Local Rule 56.1 statements that Picone played no role in Darlington's decision to discharge Perez and "Darlington played no role in Picone's discipline decision regarding Koziol's June and July 2009 beer purchase." *Post* at 28, citing Dkt. 59, ¶¶ 41, 45 (Thorntons' Local Rule 56.1 Statement of Undisputed Facts) and Dkt. 62, ¶¶ 41, 45 (Perez's Response). The point is an important one because of the procedures that district courts use to clarify and sharpen the issues to be decided on a summary judgment motion. And Perez did not respond in the district court as clearly as she should have.

The problem, though, is that Thorntons' same paragraphs of supposedly undisputed facts and its evidence offered to support its Local Rule 56.1 Statement contradict its assertions that Darlington played no role in Picone's decision to discipline but not fire Koziol and that Picone played no role in the decision to fire Perez. Where the moving party has undermined its own Local Rule 56.1 assertion through the presentation of contradictory assertions and evidence, a non-movant's "admission" of the movant's assertion is not decisive.

To find otherwise would serve only to reward parties who successfully obfuscate the record and engage in "gotcha" litigation tactics.

Thorntons' paragraphs about Koziol's wrongdoing and Picone's decision merely to warn him show on their face that Darlington was involved in the investigation, the disciplinary decision, and the warning. In fact, the paragraphs do not even cite any testimony from Picone himself. They rely instead on Darlington as the source of evidence about Koziol's wrongdoing, its discovery, the investigation, and the disciplinary decision. Dkt. 59, ¶¶ 43–45. That fact alone should raise doubts about the assertion that Darlington "played no role" in the decision.

The evidence cited by Thorntons also directly controverts its assertion. At pages 89 to 95 of Darlington's deposition, he described his own investigation of Koziol's conduct, with only brief mention of Picone's involvement:

> Q: And supposedly Mr. Koziol was making this private purchase to make up for that shortage, correct?
>
> A: Correct.
>
> … .
>
> Q: What did *he tell you* it was for?
>
> A: *He told me* he wanted to pay the shortage so it wouldn't appear on his weekly counts that he had a beer shortage. He wanted the store and the team members at the store to think that there was no issue. He thought by doing that, the

person who was stealing from him would just keep doing it and he would catch them. *That was Don's* [Koziol's] *words to me.*

*Id.* at 89–90, cited by Dkt. 59, ¶ 44 (emphasis added).

And this exchange, at page 92 of Darlington's deposition, was also presented to the district court as evidence underlying Thorntons' 56.1 Statement:

Q: Did Mr. Koziol tell you who he suspected, if anyone, of theft?

A: No.

Q: *Did you ask?*

A: *Yes.*

Q: Did he refuse to answer?

A: No, he said he didn't know.

*Id.* at 92, cited by Dkt. 59, ¶44 (emphasis added).

Darlington's own testimony described his role in the decision-making process for Koziol:

Q: To your knowledge, was there any discussion about termination of Don Koziol because of this?

A: It was taken into consideration.

Q: Was your opinion sought with regard to whether or not Don Koziol should be terminated for this situation?

A: There's only one reason why Don did not get terminated.

Q: And why is that?

A: Because he put, personally, on his credit card and not created a shortage for Thorntons. We checked  … . He took his own money, his own credit card and paid that credit card statement. *So we took that as a write-up*; and if it happens again, you will be terminated. But since it did not cause us any shortage, was the difference.

Q: But it was a violation of company policy?

A: Sure was.

Q: Including he falsified documents, did he not?

A: Sure did.

Q: Was this a performance opportunity for coaching?

A: It was more than coaching.

Q: That was by you and others?

A: *By me and Sam Picone.*

*Id.* at 93–95, cited in Dkt. 59, ¶44 (emphasis added).

Thus, Thorntons' assertion in its Local Rule 56.1 Statement that "Darlington played no role in Picone's discipline decision regarding Koziol's beer purchase other than presenting Koziol with the written reprimand in August 2009" cannot be reconciled with the rest of the paragraph and with Thorntons' own evidence. There is ample evidence from Thorntons itself that Darlington was at the center of the investigation of Koziol and was present and involved in the decision not to fire him

just a few months before he decided to fire Perez for arguably comparable wrongdoing.

The issue of Picone's involvement in the decision to fire Perez presents similar problems for Thorntons. The Local 56.1 Statement of supposedly undisputed facts shows on its face that Darlington consulted his boss, Picone, before firing Perez. Dkt. 59, ¶ 41. A jury could certainly infer that Darlington was seeking his boss's consent and that Perez would not have been fired if Picone had disagreed.

In response to Thorntons' motion for summary judgment, Perez pointed out that Thorntons' filings contradicted themselves. That assertion was too general, but as noted, the contradictions were evident from the face of Thorntons' own statement of supposedly undisputed facts. They became stark upon the lightest scrutiny of the cited evidence. It was not necessary for Perez to present contradictory evidence to show a genuine issue of fact; Thorntons itself had already done so.

Even if the record were less clear, however, Thorntons' argument that Darlington and Picone acted so independently that Koziol and Perez cannot meaningfully be compared misses the mark. The point of determining whether different decision makers were responsible is to determine whether two employees were held to different standards by virtue of the different perspectives and expectations of different and independent decision makers. The inference of discrimination is weaker when there are independent decision makers since they "may rely on different factors when deciding whether, and how severely, to discipline an employee." *Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 826 (7th Cir. 2008). But in this

familiar supervisory structure, where a supervisor and his supervisor were both involved in the decision-making process for both employees, and the employees under review were subject to the same standards, an employer cannot defeat the inference of impermissible disparate treatment by designating one supervisor as the nominal decision maker for one decision and the other supervisor as the nominal decision maker for the other. See, *e.g.*, *Coleman*, 667 F.3d at 848 (employees were similarly situated although immediate supervisors not identical; higher-level decision maker was "responsible" for employees' discipline). Even without Darlington's testimony, Thorntons' statement of undisputed fact shows that Darlington and Picone were acting in concert in both decisions, each fully aware of what the other was doing and why. Darlington sought Picone's approval for firing Perez; Darlington was present and involved when Picone disciplined Koziol. The bare statements that Picone was the nominal decision maker for Koziol and Darlington for Perez do not distinguish Koziol from Perez, at least as a matter of law.

In sum, Perez and Koziol answered to the same decision makers, were measured by the same standards, and committed similar but not identical infractions, yet Perez, a Hispanic female, was fired and Koziol, a non-Hispanic male, was not. In reviewing a grant of summary judgment, we must view the facts and record in a light most favorable to Perez, and on this record, the two were arguably similar enough to support a prima facie case. Perez satisfied her prima facie burden under the indirect method of proof.

B. *Pretext*

Perez must next offer evidence supporting an inference that Thorntons' stated non-discriminatory reason for her termination—failure to "control cash and/or inventory"—was a pretext for illegal discrimination. Perez "must present evidence suggesting that the employer is dissembling." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Id*. "It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 627 F.3d 596, 601 (7th Cir. 2010), quoting *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005).

There is no dispute that Perez discounted the candy and completed the purchase, and no suggestion that Thorntons fabricated the incident or its belief that the incident happened. However, "[i]f the stated reason, even if actually present to the mind of the employer, wasn't what induced him to take the challenged employment action, it was a pretext." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006). There is sufficient evidence in this record to infer that the discounted purchase was not Thorntons' true reason for Perez's termination.

For purposes of Thorntons' motion for summary judgment, we assume that Koziol, who had previously made sexist

remarks, granted Perez permission to mark down the candy. We also assume that Darlington knew of Koziol's prior expression of bias, but when he learned of Perez's discounted purchase, chose to believe Koziol over Perez when Perez told him that she had Koziol's permission and Koziol said she did not.[2] Darlington also knew when decided to fire Perez that Koziol had committed a similar infraction a few months earlier but had not been fired. A jury could reasonably infer from these facts that Thorntons' decision to fire Perez was discriminatory and that its stated reason for its decision was a pretext. See *Coleman*, 667 F.3d at 857–59 (different treatment of

---

[2] Perez does not explicitly rely on a "cat's paw" theory. See *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012) ("the 'cat's paw' metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action"); accord, *Staub v. Proctor Hosp.*, —— U.S. ——, 131 S. Ct. 1186, 1192–94 (2011). She contends instead that Darlington was "a knowing participant" in her wrongful termination. Indeed, we assume that Darlington relied on Koziol's version of events in spite of his knowledge that Koziol had earlier made biased remarks. Although Perez has not embraced a "cat's paw" theory, it would certainly seem to apply here. In fact, the inference is even stronger than in the usual "cat's paw" situation. If Perez's testimony is believed, Darlington was not Koziol's unknowing pawn but chose to credit Koziol in spite of his knowledge of Koziol's bias.

comparable employees can support inference of pretext), citing *McDonnell Douglas v. Green*, 411 U.S. at 804, and other cases.

Thorntons argues that any inference of discrimination is negated because Darlington both hired and promoted Perez before he fired her. The "common actor" or "same actor" inference is a reasonable inference that may be argued to the jury, but it is not a conclusive presumption that applies as a matter of law. *Blasdel v. Northwestern Univ.*, 687 F.3d 813, 820 (7th Cir. 2012), citing *Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 747 (7th Cir. 2002). The argument is that if the decision maker was unbiased when he hired or promoted the plaintiff, it's reasonable to infer that he was unbiased when he later fired the plaintiff. That inference is "something for the trier of fact to consider." *Herrnreiter*, 315 F.3d at 747.

Our dissenting colleague asserts that Koziol's sexist comments were "stray remarks" that do not support a finding of pretext. *Post* at 34, citing *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006). Standing alone, biased comments do not establish discriminatory motive unless they were by the decision maker and can be connected to the decision. See, *e.g.*, *Overly v. KeyBank Nat. Ass'n*, 662 F.3d 856, 865 (7th Cir. 2011); *Davis v. Time Warner Cable of Southeastern Wis., L.P.*, 651 F.3d 664, 672–73 (7th Cir. 2011); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) ("Isolated comments that are no more than stray remarks in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus.") (quotation omitted).

If Koziol's biased remarks stood alone here, we might agree. But they do not. For purposes of summary judgment, we must assume also that Darlington, who later decided to terminate Perez, was informed of Koziol's bias, chose to place Perez at his store anyway, and later, when Darlington investigated Perez's decision to sell the discounted candy to herself, was told by Perez that Koziol had given permission for her purchase. Koziol denied that he had done so. Darlington chose to credit Koziol in spite of his knowledge that Koziol harbored a sexist bias. Also, Darlington knew at the time that he decided to terminate Perez that Koziol himself had committed a similar infraction a few months earlier but had not been fired. A jury could reasonably infer from this record that Thorntons' stated reason for its decision to fire Perez was a pretext.

This case actually highlights an interesting linkage, or perhaps a disconnect, between the cases using the "common actor" inference and cases dealing with "stray remarks." The common actor inference says it is reasonable to assume that if a person was unbiased at Time A (when he decided to hire the plaintiff), he was also unbiased at Time B (when he fired the plaintiff). Again, that is not a conclusive presumption, but we treat it as a reasonable inference. *E.g.*, *Herrnreiter*, 315 F.3d at 747. Some "stray remarks" cases, though, seem to conclude that if a person was racist or sexist at Time A (time of the remark), it is *not* reasonable to infer that the person was still racist or sexist at Time B (when he made or influenced the decision to fire the plaintiff). See, *e.g.*, *Bahl v. Royal Indemnity Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997). Cf. *Hunt v. City of Markham*, 219 F.3d 649, 652–53 (7th Cir. 2000) (courts must take

care not to over-read "stray remarks" cases; remarks may be probative of discriminatory intent if made by decision makers or those with input into the decision, and if made around of the time of and in reference to adverse employment action).

It is not clear why one inference should be reasonable and the other not. The question, however, need not be answered in the abstract. In this case, plaintiff Perez has offered evidence: (a) that her supervisor expressed his bias against her for being a woman and Hispanic, (b) that he gave her permission to make the discounted purchase that led to her firing and then lied about doing so when asked by his supervisor, and (c) that his supervisor who decided to fire Perez was aware at least of the bias against women and had been involved in the decision merely to warn her supervisor for comparable wrongdoing.

We do not presume lack of bias when the same person has both hired and fired the plaintiff, but we allow the jury to hear such evidence and weigh it for what it is worth. We do so even though the hiring may be distant in time from the firing decision. Similar reasoning applies to Koziol's remarks, which were made about a year before Perez's termination. The time difference might lessen their evidentiary punch, but the passage of time does not make them inadmissible. Just as the jury should be permitted to consider the fact that Darlington hired and promoted but then fired Perez, it should also be able to consider that Koziol expressed bias against women and Hispanics in the workplace a year before he became a witness in the investigation into Perez's conduct and provided information to Darlington that led to her firing. We do not hold that Koziol's remarks standing alone would be sufficient to satisfy Perez's entire evidentiary burden at summary

judgment. But Koziol's remarks are part of the evidence of pretext that the jury should have the opportunity to weigh at trial.

Accordingly, Perez has satisfied the indirect method of proof sufficient to avoid summary judgment.

II. *Direct Method*

Under the direct method of proof, a plaintiff must provide either direct or circumstantial evidence that the employer had a discriminatory motive. *Naficy*, 697 F.3d at 509. Direct evidence of discrimination would require something akin to an admission by Thorntons that it fired Perez because of her national origin or gender. See *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). Perez does not present such evidence. Instead, she proceeds under the direct method using circumstantial evidence. To prevail, Perez must "construct a convincing mosaic" that "allows a jury to infer intentional discrimination by the decisionmaker." *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012) (internal quotation marks omitted). Generally, but not exclusively, the pieces of that "mosaic" will fall into three categories. The first includes "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn." *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1180 (7th Cir. 2013) (quotation omitted). The second is "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently." *Id*. And the third is "evidence that the employer offered a pretextual reason for an adverse employment action." *Id.*

Perhaps illustrating the eroding boundary between direct and indirect proof, our discussion of the indirect method shows how Perez has offered a direct case. Perez has presented circumstantial evidence here from which a jury could reasonably infer that her firing was the product of illegal discrimination. Darlington knew that a few months earlier, Koziol had been warned but not fired when he concealed the fact that a large quantity of alcohol had been stolen from the store and then concocted a secret and risky scheme to catch the thief by inviting additional theft. His conduct did not cause the store to suffer actual economic loss, but he covered up actual economic loss and risked future economic loss. We must assume that Darlington also knew that Koziol had expressed his bias against women in the past. And, we must assume that he knew that Koziol had given Perez permission to mark down the candy bars and sell them to herself. Yet, in spite of this knowledge, Darlington decided to fire Perez, while Koziol had not been fired for arguably comparable conduct. This is sufficient circumstantial evidence to construct the "convincing mosaic" that would allow a jury to infer that the decision to terminate Perez was impermissibly biased.

Thorntons contends, and the dissent agrees, that Koziol's biased remarks cannot establish discriminatory motive because they were isolated, stray remarks. *Post* at 38-39. We do not find that Koziol's remarks would be sufficient standing alone. But his remarks do not stand alone. They are coupled with the other evidence in the record, including especially the fact that Koziol, a non-Hispanic male, received merely a warning while Perez, a Hispanic female, was fired, for arguably comparable "inventory control" infractions, and that Perez's firing was

founded on Darlington's decision to credit Koziol—in spite of his known bias—over Perez. Whether Darlington actually embraced Koziol's bias or whether Koziol's bias merely infected Darlington's investigation and ensuing decision to fire Perez, we cannot, at least as a matter of law, disregard Koziol's comments as "stray remarks" that say nothing about Perez's firing.

Whether Perez will be able to convince a jury that she was fired because of her gender or national origin remains to be seen, but she is entitled to have a jury answer those questions. On this summary judgment record, Perez prevails under both the indirect and direct methods of proof. The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

Ripple, *Circuit Judge*, dissenting. The majority reaches the conclusion that Ms. Perez's claim of discriminatory discharge should reach the jury by abandoning the procedural constructs and the substantive standards that have long governed our review of discrimination cases. I believe that, when properly applied, these cornerstones of our jurisprudence lead to the conclusion that, as a matter of law, Ms. Perez cannot establish a claim for intentional discrimination. I therefore respectfully dissent.

### A.

Beginning, as did the majority, with the indirect method, Ms. Perez bears the initial burden of establishing a prima facie case of discrimination by showing that a similarly situated employee outside her protected class committed a similar infraction and was treated less harshly. *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004). The similarly situated employee does not have to be identical, but, to meet her burden, Ms. Perez must point to an employee who is similar to her in all material respects. "A meaningful comparison is one which serves 'to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008) (quoting *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)); *see also Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675-76 (7th Cir. 2012). "In disciplinary situations, we have further interpreted this part of the test as requiring a showing that the two employees

dealt with the same supervisor, were subject to the same workplace rules, and engaged in similar conduct, but nonetheless received disparate treatment for no apparent legitimate reason." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939-40 (7th Cir. 2003).

Ms. Perez, a Thorntons retail store manager, proposes to meet this burden by comparing herself to her supervisor and store general manager, Don Koziol. She contends, contrary to the facts she admitted in her Local Rule 56.1 statement and discussed in her opposition to summary judgment, that she and Koziol were disciplined by the same decisionmaker. She also maintains that her action of purchasing candy bars for herself at a steep discount and causing a loss to Thorntons is essentially the same conduct as Koziol's action of making up a loss by using personal funds to pay full price for missing alcohol. Faithful adherence to the principles in our established case law precludes our acceptance of these arguments.

### 1.

First, Ms. Perez cannot now allege that she and Koziol were disciplined by the same decisionmaker because she is bound by the admissions that she made in her Local Rule 56.1 statement. In its Local Rule 56.1(a) statement of undisputed facts, Thorntons stated that Darlington made the decision to fire Ms. Perez and that "Darlington played no role in Picone's discipline decision regarding Koziol's June and July 2009 beer purchase." R.59 ¶¶ 41, 45 (Defendant's Statement of Undisputed Facts). Ms. Perez's Local Rule 56.1(b) statement in response did not dispute these facts, *see* R.62 ¶¶ 41, 45, thus

they are deemed admitted, N.D. Ill. L. R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party."); *see also Adams*, 324 F.3d at 937 ("accepting as true the material facts submitted by Wal-Mart that Adams did not properly contest"). The district court correctly relied on the Local Rule 56.1 statements in ruling on the summary judgment motion, *see Koszola v. Bd. of Educ.*, 385 F.3d 1104, 1109 (7th Cir. 2004) ("[A] district court is entitled to decide the motion based on the factual record outlined in the [Local Rule 56.1] statements." (internal quotation marks omitted)), and, in relying on those statements, correctly determined that the difference in decisionmaker was one of the confounding variables that prevented an adequate comparison between Koziol and Ms. Perez, *see Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008) ("So, to be similarly situated, a manager must have been treated more favorably by the same decisionmaker … ."). At this stage, we are not at liberty to look beyond Ms. Perez's admissions in her statement. *See Koszola*, 385 F.3d at 1109 ("[O]ur *de novo* review of [the district court's] grant of summary judgment will likewise rest only on the [defendant's] Local Rule 56.1(a) statement and [the plaintiff's] Local Rule 56.1(b) response.").[3]

---

[3] The majority spends several pages explaining why, despite Ms. Perez's failure to "respond … as clearly as she should have" to Thorntons' Rule 56.1 statement, the court nevertheless should look beyond that failure in determining whether the district court erred in granting summary judgment. Maj. Op. at 13.

With respect, I disagree with my colleagues on one matter of record:
(continued...)

[3] (...continued)

Ms. Perez did not simply fail "to respond … as clearly as she should have" to Thorntons' statements regarding who made the decisions to terminate her employment (Darlington) and to discipline Koziol (Picone). Ms. Koziol did not dispute these facts *at all* in her responsive statement. Moreover, in her brief in opposition to Thorntons' motion for summary judgment, she affirmatively identified Darlington as the decisionmaker who made the decision to terminate her employment. *See* R.61 at 5 ("Here, we have Darlington, the decision-maker … ."); *id.* ("Mr. Darlington fired her … .").

I also cannot agree with my colleagues that the record evidence contradicts Thorntons' "assertions that Darlington played no role in Picone's *decision* to discipline but not fire Koziol and that Picone played no role in the decision to fire Perez." Maj. Op. at 13 (emphasis added). The exchange that the majority recounts on pages 14-16 of its opinion begins, as identified in Thorntons' Rule 56.1 statement ¶ 43, on page 88 of Darlington's deposition, with the following set of questions:

> Q      Did you, yourself, investigate the circumstances of [Koziol's] situation?
>
> A      I was involved in the investigation.
>
> Q      Okay. What part did you play?
>
> A      I accompanied Sam Picone when he went to the store to get Don's statement.
>
> Q      When you say "get Don's statement," do you mean a written statement?
>
> A      No, just orally.
>
> Q      That happened in the office?
>
> A      At Store 301, yes.
>
> Q      With just the three of you?
>
> A      Yes.

(continued...)

Second, although Ms. Perez and Koziol both violated store policies and each's conduct was categorized generally as a problem with "inventory control," the underlying facts of each situation were vastly different. Koziol noticed missing inventory and used his personal funds to make up for any loss

---

[3] (...continued)
R.60-4 at 17 (Darlington Dep. 88). Darlington could speak with authority as to what transpired during the investigation of Koziol because he was present when it occurred and, perhaps, although it is not entirely clear, participated in the questioning of Koziol. None of the testimony that follows, which details Koziol's statement and the actions that ensued, contradicts Thorntons' assertion in its Rule 56.1 statement that "Darlington played no role in Picone's *discipline decision* regarding Koziol's June and July 2009 beer purchase … ." R.59 ¶ 45 (emphasis added). Indeed, that may have been the reason that Ms. Perez did not contest the fact in the district court.

In the end, the majority's effort to tease out of the record a genuine issue of triable fact not asserted in the Rule 56.1 statements proves too much. Indeed, its effort demonstrates the *value* of Rule 56.1 in "clarify[ing] and sharpen[ing]" the issues for the court's consideration. Maj. Op. at 13.

> [Local Rule] 56.1 and similar rules assist the district court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence." *Bordello v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000) (citation omitted). It is not the duty of the district court to scour the record in search of material factual disputes, nor is it ours.

*Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill.*, 424 F.3d 659, 664 n.2 (7th Cir. 2005). Ms. Perez failed to comply with the local rules, and, in an effort to make her case for her, the majority, in derogation of Rule 56.1, has scoured the record in a futile searcfor factual disputes.

to the employer. Ms. Perez *created* loss for the employer by selling inventory to herself at a steep discount. She does not dispute that Darlington fired her for marking down and purchasing the candy without approval, R.62 ¶ 42, or that "Picone did not discharge Koziol because Koziol paid full retail value for the alcohol," *id.* ¶ 45. The majority takes the view that a jury may perceive Koziol's actions to be on par with those of Ms. Perez, and that, therefore, we must send this case to the jury. *See* Maj. Op. at 10-12. Respectfully, our case law requires another approach. "We have repeatedly said we do not sit as a super-personnel department to determine which employment infractions deserve greater punishment. It is enough that the misconduct that led to the adverse job action in question is sufficiently distinct to render the proposed comparators not similarly situated." *Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444, 449 (7th Cir. 2012) (citation omitted). Darlington was entitled to conclude that Ms. Perez's conduct, which resulted in an actual loss to the company, was materially different from Koziol's conduct, which had no such effect. The mere fact that both might, in the most general sense, be given the generic label of "inventory control" does not mean that Thorntons was required to characterize them in that manner and to address them in the same way. Thorntons was entitled to assess the conduct of Koziol and that of Ms. Perez in terms very different from the second-guess of the majority. It was entitled to regard Ms. Perez's action as pilferage of company assets and Koziol's as involving no such loss but constituting poor managerial judgment. An employer is free to respond to dissimilar conduct in different ways, *cf. Adams*, 324 F.3d at 940 (concluding that a situation involving an employee who ate

another employee's pudding was "significantly different" from a situation where an employee allegedly stole $12.65 from another employee), and such an approach does not suggest an invidious motive.[4]

## 2.

Even if Ms. Perez had met her burden by pointing to a similarly situated employee, she fails to point to evidence showing that Thorntons' legitimate, non-discriminatory business reason for her termination—that Ms. Perez's policy violation caused a loss to the company—was pretextual. To rebut an employer's legitimate, non-discriminatory reason for an employment decision, the plaintiff must point to evidence tending to show that the employer's reason is a lie, not just that the employer's evaluation was incorrect. *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010)*; Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997). To show pretext, the plaintiff must do more than assert that "a jury could disbelieve" the reason proffered by the employer.

---

[4] I also note that Ms. Perez fails to point to any evidence suggesting that she and her supervisor had the same roles, were subject to the same discipline standards and were subject to the same workplace rules. The little record evidence on this topic suggests that they had different roles and were subject to at least some differing rules. *See* R.60-5 at 12 (Perez Dep. 44) (noting that Koziol set the work schedule for the store); *id.* at 14 (Perez Dep. 54-55) (noting that Koziol had a more flexible work schedule); R.60-4 at 33 (Darlington Dep. 52) (same). Thorntons, however, did not offer these differences as a basis for the more severe discipline imposed upon Ms. Perez.

*Johnson v. Hondo, Inc.*, 125 F.3d 408, 415 (7th Cir. 1997); *cf. EEOC v. G-K-G, Inc.*, 39 F.3d 740, 746-47 (7th Cir. 1994) (noting that a plaintiff "could not … have gotten to the jury if his only 'evidence' had been that the defendants' witnesses were not worthy of belief"). Rather, she "must point to evidence suggesting that [the employer] itself did not honestly believe that explanation." *Giannopoulous v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997); *see also Adams*, 324 F.3d at 939-40 ("It was up to Adams to produce evidence showing that Wal-Mart did not genuinely believe that she had lifted the $12.65."). In making this showing, "stray remarks" usually are insufficient to establish pretext unless "those remarks are made by the decision-maker or one having input in a decision, and are made (1) around the time of, and (2) in reference to, the adverse employment action complained of." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006) (internal quotation marks omitted).

Here, the only evidence in support of Ms. Perez's claim that Darlington was lying about the reason behind his decision to terminate her is that, in November 2008, approximately one year before Ms. Perez was terminated, she told Darlington that Koziol had told her that Koziol does not like to work with women. This single comment, removed temporally from the termination decision and by someone who did not participate in the decision, is simply not sufficient to show that Darlington's testimony was a lie. Ms. Perez speculates that the year-old comment "tainted" Darlington's decision, but she points to no evidence suggesting that Koziol had the slightest influence over Darlington or that Darlington harbored his own

discriminatory views. The fact that a jury *could* disbelieve Darlington is not sufficient. *See Johnson*, 125 F.3d at 415.

The majority suggests that, although the passage of time "might lessen th[e] evidentiary punch" of these remarks, it "does not make them inadmissible." Maj. Op. at 23. However, "remarks unrelated to the employment decision in question may not overcome summary judgment if they stand alone as evidence of the employer's discriminatory intent." *Huff v. UARCO, Inc.*, 122 F.3d 374, 385 (7th Cir. 1997). It is undisputed that Koziol's remarks allegedly were made and reported to Darlington one year prior to Darlington's decision to terminate Ms. Perez's employment. Koziol's remarks, therefore, as a matter of law, cannot suffice to establish pretext.

The majority posits, however, that these remarks do not stand alone—that they must be evaluated in light of the difference in punishment meted out against Koziol for his inventory infraction and Ms. Perez for hers. However, nothing about the disparity in punishment suggests that Thorntons' proffered reason for terminating Ms. Perez's employment—that her actions resulted in actual economic loss to the company—was a lie. The majority criticizes Thorntons' approach because, in its view, Koziol's scheme was more detrimental to the company; according to the majority, Koziol's actions "risked future economic loss." Maj. Op. at 25. Therein, however, the majority validates the distinction Thorntons drew. Koziol's actions, at some point in the future, may have, but as of yet had not, affected Thorntons' bottom line. Ms. Perez's actions had. Indeed, Darlington testified to just this distinction:

[Darlington]:      There's only one reason why Don [Koziol] did not get terminated.

Q[uestion]:       And that is what?

[Darlington]:     Because he put, personally, on his credit card and not created a shortage for Thorntons.

R.60-4 at 19 (Darlington Dep. 94).

**B.**

Ms. Perez's effort to set forth a claim under the direct method suffers from similar infirmities. A case under the "direct" method may rely on circumstantial evidence, but "[t]hat circumstantial evidence[] … must point directly to a discriminatory reason for the employer's action." *Adams*, 324 F.3d at 939. It is not sufficient that a jury might guess or speculate that gender or "race might have made a difference in the decision," because "guesswork and speculation are not enough to avoid summary judgment." *Good*, 673 F.3d at 675. "[T]here must be a real link between the bigotry and an adverse employment action." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (noting that a statement such as, "Old women are hard to deal with," without more, does not show intentional discrimination). The court views the evidence in the light most favorable to the plaintiff and makes reasonable inferences therefrom, but reasonable inferences do not include every possible inference, only those supported by the record. *Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 863 (7th Cir. 2011).

As with the indirect method, stray remarks do not point directly to discrimination unless the decisionmaker or one with input in the decision made the comment around the time of, or in reference to, the adverse employment action. *Id.* at 865. "Further, the 'statements of a person who lacks the final decision-making authority may be probative of intentional discrimination,' but only 'if that individual exercised a significant degree of influence over the contested decision.'" *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 782 (7th Cir. 2007) (quoting *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 813 (7th Cir. 2007)).

Ms. Perez's circumstantial evidence that Darlington was motivated by gender or race animus consists of the following: In 2008, Darlington transferred Ms. Perez to give her experience at a higher level store. When Ms. Perez met Koziol, Koziol told her that he did not like to work with women; in response, Ms. Perez reported this statement to Darlington and requested to be moved back to her former position. Darlington told Ms. Perez that Koziol's store was the only opening and that she could work there or leave the company. One year later, in November 2009, Darlington conducted an investigation into Ms. Perez's manual override of the price of a large number of candy bars. Darlington, after consultation with Roberts (from human resources), met with Koziol about the override, who denied knowing about the override or giving permission to conduct the override. Darlington, with Roberts conferenced in by telephone, then met with Ms. Perez, who claimed that Koziol gave her permission to perform the override. After Ms. Perez departed, Darlington spoke with

Roberts and expressed his desire to terminate Ms. Perez's
employment; Roberts agreed with that decision.

Here, the employment action was taken by Darlington, in
consultation with Roberts. There is no evidence in this record
that Darlington or Roberts ever harbored an insidious motive.[5]
In order to prevail, Ms. Perez not only must tie Koziol's sexist
statements to Darlington, but establish that Koziol's alleged
sexism infected Darlington's decision to terminate Ms. Perez's
employment. Ms. Perez's direct evidence case relies, therefore,
on the force and effect that Koziol's discriminatory statement
had on Darlington's decision nearly one year after it was made.
We have held that if discriminatory "remarks are not contem-
poraneous with the discharge or causally related to the
discharge decision making process, they are insufficient to
create a triable issue of material fact regarding discrimination."
*Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 611 (7th Cir. 2001)
(internal quotation marks omitted). Had Ms. Perez's discharge
been based on a potentially false report by Koziol shortly after
he made a known, derogatory statement about women or
Hispanic employees, then there might be a triable issue of fact.
That is not the situation we have here. Here, taking the
evidence in the light most favorable to Ms. Perez, Darlington

---

[5] The majority emphasizes that Darlington knew of Koziol's bias against
women employees because of Koziol's year-old statement. From that
knowledge, without any evidence that Darlington shared that bias, the
majority holds it is entirely appropriate to assume that Darlington shared
Koziol's bias and acted on it. It fails to address why it is not just as
likely—and perhaps more likely—that a senior manager, knowing of a
subordinate's bias, would take that bias into account in assessing the
subordinate's account of the transaction.

had knowledge of only one discriminatory comment by Koziol, and there was no temporal or causal connection between that remark and her discharge. Under our case law, such a remark does not raise the spectre of discrimination, and Darlington was entitled to conclude similarly in making his termination decision.

Ms. Perez's case also cannot be saved under the "cat's paw" theory. "The cat's paw theory applies in the employment discrimination context when a biased subordinate who lacks decision-making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Johnson v. Koppers, Inc.*, 2013 WL 4022294, at *3 (7th Cir. Aug. 8, 2013) (internal quotation marks omitted). The cat's paw theory, however, cannot be employed to impute a discriminatory motive to an unbiased decisionmaker when the "decisionmaker conducts a meaningful and independent investigation of the information being supplied by the biased employee." *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 383 (7th Cir. 2011). Here, there is no question that Darlington both viewed the video of Ms. Perez conducting the override and interviewed Ms. Perez in person concerning her actions.

In sum, this record does not contain circumstantial evidence that "point[s] directly to a discriminatory reason for the employer's action." *Adams*, 324 F.3d at 939. The district court, therefore, did not err in concluding that Ms. Perez had failed to establish a discriminatory discharge under the direct method.

## C.

The approach employed by the majority does not simply force Thorntons to defend a discrimination claim that has no basis in fact. It creates serious ambiguity, and instability, into settled law. It will encumber, substantially, the work of both the bench and bar in this frequently litigated area.

This decision signals the end of Rule 56.1 statements as an effective means of narrowing the factual issues before the district courts. If appellate panels are free to look beyond these statements to determine if parties have raised genuine issues of material fact, then litigants will not take seriously their obligations under Rule 56.1, and the district courts will lose an important tool for "organizing the evidence and identifying disputed facts," *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005), and instead will be "obliged … to scour the record looking for factual disputes," *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994).

Stray remarks, even those of ancient vintage and not in any way attributable to the decisionmaker, will now result in employer accountability. Similarly, the "cat's paw" theory of employer liability has been cut loose from its logical and experiential moorings to become a virtual engine of destruction of good-faith efforts to administer a fair employee disciplinary system. After today's decision, if it remains the law of the circuit, an employer can no longer act with the confidence that he has obeyed the law if he treats similarly situated individuals similarly in disciplinary matters. His assessment of the similarity of employee conduct in the real-world circumstances of the workplace will now be subject to appellate court re-

characterization at a meaningless level of abstraction. The Supreme Court has stated that we must "ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). When the remarks of an employee, made approximately one year prior to a termination decision, can be imputed to an employer and used as a basis for Title VII liability, however, employers will have no choice but to put into place and rigorously enforce just such a code.

This case, if decided under the established norms of this court's jurisprudence, would pose no extraordinary question of law and would yield no novel principle or unique methodology to disturb the established expectations of the practicing bench and bar. Unfortunately, today's opinion takes a different course. Its interpretation of established law and the methodology it sanctions will have, I fear, a jarring effect on the bench and bar of the circuit. It will unduly confuse and complicate the tasks of those who judge, litigate and counsel in this important area of discrimination law. Accordingly, I respectfully dissent.